**REVERSE, REMAND, and AFFIRM; and Opinion Filed May 31, 2013.**



**In The**
**Court of Appeals**
**Fifth District of Texas at Dallas**

_____

**No. 05-12-00681-CV**
_____

**CHILDREN'S MEDICAL CENTER OF DALLAS, AMY HOLLAND, CPNP,**
**DAVID W. KINES, FNPC, LAWSON COPLEY, M.D., J. PATRICK HIEBER, M.D.,**
**LORI A. THORNTON, RN, FNPC, AND TIMOTHY J. RUPP, M.D.,**
**Appellants and Cross-Appellees**
**V.**
**SHERI DURHAM AND DENISE JENKINS,**
**AS ADMINSTRATOR OF THE ESTATE OF JESSICA HALEY DURHAM,**
**Appellees and Cross-Appellants**

**On Appeal from the County Court at Law No. 4**
**Dallas County, Texas**
**Trial Court Cause No. CC-11-01231-D**

**OPINION**
Before Justices Francis, Murphy, and Evans
Opinion by Justice Murphy

In this interlocutory appeal, appellants challenge the trial court's orders denying their motions to dismiss appellees' health care liability claims for failure to file an expert report complying with the requirements of chapter 74 of the Texas Civil Practice and Remedies Code. *See* TEX. CIV. PRAC. & REM. CODE § 51.014(a)(9) (West Supp. 2012) (permitting interlocutory appeal from denial of all or part of relief under section 74.351(b) of the Texas Civil Practice and Remedies Code). In a cross-appeal, appellees challenge the trial court's order granting the motion of Children's Medical Center of Dallas (CMC) to dismiss all direct liability claims against it. We affirm the trial court's denial of appellees' motions to dismiss, and sustain

appellees' sole issue in their cross-appeal. We therefore affirm the trial court's orders in part and reverse in part.

BACKGROUND

Jessica Haley Durham died on Christmas Day, 2008, from a ruptured aortic dissection. In their operative petition, appellees/plaintiffs contend "Jessica's death was preventable had Defendants appropriately responded to Jessica's aortic issues on a timely basis." Appellants Copley, Hieber, and Rupp are doctors. Appellants Holland, Kines, and Thornton are nurse practitioners employed by appellant CMC.

Jessica was injured in a car accident on July 26, 2006, on the island of Maui, Hawaii. According to appellees' petition, Jessica "suffered a left distal femur fracture, right radial and ulna facture, a ruptured spleen, pulmonary contusions, respiratory failure and lacerations, and chest trauma." Jessica's father was killed in the accident. After initial treatment at a hospital in Maui, Jessica was transferred to Kapi'olani Medical Center for Women & Children in Honolulu. While at Kapi'olani, Jessica was diagnosed with an enlarged aorta. Her medical records from Kapi'olani reflected this diagnosis, as well as a recommendation for follow-up care by a pediatric cardiologist on her return to Texas. Jessica was treated at Kapi'olani until August 15, 2006, when she was transferred from Kapi'olani to the emergency room at CMC. She was evaluated at CMC and then discharged with instructions to return to the CMC orthopedic clinic on August 21, 2006, for follow-up care for her leg injury.

J. Patrick Hieber, M.D., a pediatrician, was Jessica's primary care doctor from her birth until her death. He communicated with physicians at Kapi'olani prior to Jessica's transfer to CMC. On her arrival at the CMC emergency department, Jessica was evaluated by Timothy J. Rupp, M.D., an emergency room physician, and by Thornton, an orthopedic nurse practitioner. Thornton elicited a medical history that included the recent finding of the enlarged aorta in an

–2–

orthopedic consultation form completed by appellee Sheri Durham, Jessica's mother. Lawson Copley, M.D., a pediatric orthopedic surgeon, evaluated Jessica upon her return to CMC and was her surgeon and attending physician at all times during her admission to CMC between August 22 and 31, 2006. Copley operated on Jessica's leg on August 22, 2006. Nurse practitioners Holland and Kines worked in the orthopedic unit of CMC. Holland ordered a cardiology consultation for Jessica after Durham reported that doctors in Hawaii had determined that Jessica had an enlarged aorta. This request was cancelled thirty minutes later. An hour later, Kines placed a telephone order for a two-view chest x-ray to evaluate Jessica's aorta. The radiologist's report stated the x-ray showed no abnormality in Jessica's aorta. Jessica was transferred to Scottish Rite Hospital on August 31, 2006.

It is undisputed that before she died Jessica never received a cardiology consultation or treatment for her enlarged aorta. After her death, appellees filed this suit alleging negligence and other causes of action against appellants. Appellees filed an expert report by Ron Blair, M.D., P.A. to comply with the requirements of chapter 74. *See* TEX. CIV. PRAC. & REM. CODE § 74.351(a) (West 2011) (claimant in health care liability claim shall serve expert report). Appellants filed motions to dismiss appellees' claims for failure to file an expert report that complied with the requirements of chapter 74. *See id.* § 74.351(b) (defendant may move to dismiss health care liability claim). The trial court granted the motions and gave appellees an opportunity to amend their expert report. *See id.* § 74.351(c) (trial court may grant one 30-day extension to claimant to cure deficiency in expert report). Appellees filed an amended report, and the appellants filed new motions to dismiss. After hearings, the trial court denied the motions. This appeal followed.

ISSUES

All appellants filed separate briefs in which they argued the trial court erred by denying the motions to dismiss. Their issues are similar. Appellants challenge Blair's qualifications to render an expert opinion describing the causal relationship between any breach by any of the appellants in August 2006 and Jessica's death two years later. They challenge as conclusory and speculative Blair's opinions on the causal relationship between any breach by any of the appellants and Jessica's death. They contend that because appellees have already been given an opportunity to cure the deficiencies in Blair's report, but have not done so, their claims should be dismissed.

In addition, Copley, Kines, Thornton, and Holland challenge Blair's qualifications to testify as to the standards of care applicable to them. CMC also contends the trial court erred by refusing to dismiss the vicarious liability claims against CMC because the expert report as to Kines, Thornton, and Holland, through whom CMC potentially would be liable, was inadequate. In their cross-appeal, appellees contend the trial court abused its discretion in dismissing their direct liability claims against CMC.

STANDARD OF REVIEW

We review a trial court's ruling on a motion to dismiss a health care liability claim for an abuse of discretion. *See Jernigan v. Langley*, 195 S.W.3d 91, 93 (Tex. 2006) (per curiam); *Whitfield v. Henson*, 385 S.W.3d 708, 710 (Tex. App.—Dallas 2012, no pet.) (citing *Jelinek v. Casas*, 328 S.W.3d 526, 539 (Tex. 2010)). When we review a matter committed to a trial court's discretion, we may not substitute our judgment for that of the trial court. *Whitfield*, 385 S.W.3d at 710. A trial court has no discretion in determining what the law is or applying the law to the facts. *Walker v. Packer*, 827 S.W.2d 833, 840 (Tex. 1992) (orig. proceeding).

–4–

Appellees were required to comply with the expert report requirements of chapter 74 of the Texas Civil Practice and Remedies Code. *See* TEX. CIV. PRAC. & REM. CODE § 74.351; *Stockton v. Offenbach*, 336 S.W.3d 610, 614 (Tex. 2011). Within 120 days of filing an original petition, a claimant must "serve on each party or the party's attorney one or more expert reports" that provide a fair summary of the expert's opinions regarding applicable standards of care; how the claimant's physician or health care provider failed to meet the standards; and the causal relationship between that failure and the injury, harm, or damages claimed. TEX. CIV. PRAC. & REM. CODE § 74.351(a), (r)(6); *Key v. Muse*, 352 S.W.3d 857, 859 (Tex. App.—Dallas 2011, no pet.). The Texas Supreme Court has recently described the three elements of a valid expert report. *Certified EMS, Inc. v. Potts*, 392 S.W.3d 625, 630 (Tex. 2013). The report "must fairly summarize the applicable standard of care; it must explain how a physician or health care provider failed to meet that standard; and it must establish the causal relationship between the failure and the harm alleged." *Id.* (citing TEX. CIV. PRAC. & REM. CODE § 74.351(r)(6), and *Scoresby v. Santillan*, 346 S.W.3d 546, 556 (Tex. 2011)); *see also TTHR Ltd. P'ship v. Moreno*, 56 Tex. Sup. Ct. J. 467, 469 (Tex. Apr. 5, 2013). "The purpose of the expert report is to deter frivolous claims, not to dispose of claims regardless of their merits." *Loaisiga v. Cerda*, 379 S.W.3d 248, 258 (Tex. 2012) (quoting *Scoresby*, 346 S.W.3d at 554). The expert report "must represent only a good-faith effort to provide a fair summary of the expert's opinions." *Id.* (quoting *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 878 (Tex. 2001)).

The report must satisfy two purposes to constitute a good-faith effort. *See Potts*, 392 S.W.3d at 630; *Palacios*, 46 S.W.3d at 878. First, the report must inform the defendant of the specific conduct the plaintiff has called into question. *Palacios*, 46 S.W.3d at 879. Second, the report must provide a basis for the trial court to conclude that the claims have merit. *Id.* "A

report that merely states the expert's conclusions about the standard of care, breach, and causation does not fulfill these two purposes." *Id.* An expert's report must explain the basis of the expert's statements to link those conclusions to the facts. *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002) (per curiam). "A report need not marshal all the plaintiff's proof, but it must include the expert's opinion on each of the elements identified in the statute." *Loaisiga*, 379 S.W.3d at 258 (quoting *Palacios*, 46 S.W.3d at 878). In determining whether the expert report represents a good faith effort to comply with the statutory requirements, the trial court's inquiry is limited to the four corners of the report. *Jelinek*, 328 S.W.3d at 539 (citing *Wright*, 79 S.W.3d at 52).

When a plaintiff sues more than one defendant in connection with a health care liability claim, the expert report also must set forth the standard of care applicable to each defendant, show how that defendant's conduct failed to meet that standard, and explain the causal relationship between each defendant's individual acts and the injury, harm, or damages claimed. *See* TEX. CIV. PRAC. & REM. CODE § 74.351(a), (r)(6); *see also Eichelberger v. St. Paul Med. Ctr.*, 99 S.W.3d 636, 638 (Tex. App.—Dallas 2003, pet. denied) (citing *Palacios*, 46 S.W.3d at 878–79). But "[n]o provision of the Act requires an expert report to address each alleged liability theory." *Potts*, 392 S.W.3d at 630. A report that satisfies the three elements for a valid expert report, "even if as to one theory only, entitles the claimant to proceed with a suit against the physician or health care provider." *Id.*

### DISCUSSION

Appellants complain that Blair's report is not sufficient to establish a causal connection between their individual actions and Jessica's death. They also challenge his qualifications to opine on causation, and contend his opinions are conclusory. As noted above, the nurse

practitioners and Copley also challenge Blair's qualifications to opine as to the relevant standards of care.

Because the only information relevant to our inquiry regarding the adequacy of Blair's report is that information within the four corners of the document, we review the report in some detail. *See Palacios*, 46 S.W.3d at 878. Blair's twelve-page report addresses the role of each appellant in Jessica's treatment. He describes his qualifications, discusses the relevant standards of care and the role of each appellant, and offers his opinions regarding the link between appellants' actions or failures to act and Jessica's death. In sum, Blair opines that because Jessica was not referred to a pediatric cardiologist in Dallas for further evaluation and follow-up despite an express written recommendation to do so by a pediatric cardiologist in Hawaii, Jessica's enlarged aorta was never treated, and she died.

Blair begins the report by stating he was "asked to provide opinions regarding medical care Jessica Durham received at Children's Medical Center in Dallas following her transfer from Kapi'olani Medical Center in Honolulu, Hawaii." He explains that "[t]his case involves the standards of care applicable to: (1) a pediatrician; (2) an orthopedic surgeon acting in his role as an attending physician to a hospitalized patient needing, and having, orthopedic surgery; (3) an emergency room physician; and, (4) various nurse practitioners."

Blair then discusses his qualifications to speak to the standards of care, the breaches of those standards, and the causal relationship between those breaches and Jessica's death. He explains that he has been a pediatrician for twenty years, describes his education and professional work experience, and discusses his qualifications to speak to the standards of care in this case:

> I routinely am engaged in caring for children with complex medical issues, both in the outpatient and inpatient settings. I am knowledgeable about the standards of care that are applicable to physicians and nurse practitioners who are involved in receiving a

–7–

patient who has been transferred from one medical facility to another, which is something I have dealt with throughout my own practice. I also routinely interact with emergency room physicians when they have evaluated or treated patients or when they have requested a consultation from a pediatrician. I am familiar with the standard of care applicable to such physicians when they are involved in a hospital-to-hospital patient transfer, and when a patient has presented in the emergency room with a medical condition that is made known to the emergency room physician, that requires follow up evaluation and care.

Next, Blair discusses his qualifications for opining about the diagnosis and care of an enlarged aorta. He states that he directly diagnoses and treats medical conditions in children, and explains that "when confronted with certain issues, [he] obtain[s] consultations, diagnoses, or confirmation of [his] own diagnoses, from other physicians having particular specializations." He explains that while he may not be a specialist in that area of medicine, he is "knowledgeable about the same," and will "collaborate with the specialists in the development and implementation of diagnostic and treatment strategies." Specific to the issue here, he states, "[f]or example, I am not a pediatric cardiologist; however, I know what an enlarged aorta is, and I have been involved in the diagnosis and treatment of the same, even if a patient having that condition has been referred to a pediatric cardiologist for more specialized diagnosis and care." He continues, "[a]s a diagnostic physician, I am familiar with the generally available diagnostic and treatment modalities for an enlarged aorta, and I am familiar with the consequences of not diagnosing or treating an enlarged aorta, in particular one that is progressively enlarging." He concludes, "I either actively continue to follow my patients while under the consultative or direct care of cardiologists or I participate in the delivery of treatment."

Next, Blair discusses his regular interaction and consultation with "surgeons and their supporting health care teams" when a patient requires surgical care. He states,

I am familiar with the standard of care applicable to the surgeon and other health care professionals (such as nurse practitioners) working with other surgeons and who are involved in the process

of obtaining pre-surgical medical clearance for a patient, or who encounter an unexpected, incidental or reported finding of medical significance that requires further medical management or follow up evaluation and/or care.

He continues by explaining that he routinely interacts with nurse practitioners in a hospital setting, has supervised nurse practitioners in that setting, and "presently, and in the past, [has] served as a training and supervising preceptor for nurse practitioners in the clinical setting." He describes his knowledge of the standard of care:

I have also interacted as a physician in the setting of a hospital, where . . . nurse practitioners have been called upon to evaluate a patient who has complex medical issues or who has encountered a significant medical finding outside of his or her area of practice, and in each of these contexts, and because of my experience in each, I am familiar with the standard of care applicable to their clinical responsibilities in reporting and/or managing such conditions.

He next speaks to his qualifications to discuss the standard of care for pediatricians. He states that he has been involved as a patient's primary care physician "in the process of coordinating or assisting in the coordination of care outside of my practice when circumstances, such as an accident or illness out of town, warrant the same." He states, "I am familiar with the standard of care applicable to a pediatrician acting within the same or similar circumstances."

After discussing these qualifications, he articulates the standards of care for each appellant. He then describes in detail how each appellant breached the applicable standard of care. The breaches include failure to review Jessica's medical records from Kapi'olani; failing to advise Jessica's mother and pediatrician of the need for a cardiology consultation; failing to arrange for a cardiology consultation; ordering a chest x-ray, an "inadequate imaging modality," to evaluate the enlarged aorta; requesting and then canceling a cardiology consultation; and failing to follow up and evaluate Jessica "after her acute care by Children's Medical Center was complete." Blair concludes the report with a discussion of how the breaches or departures from

the standards of care "caused or contributed to Jessica's injuries, and ultimately, her untimely death."

*Qualifications to opine on standards of care*

We conclude Blair is qualified to opine as to the standards of care for each of the appellants, including Copley and the nurse practitioners who have specifically raised this issue. Under section 74.402(b), a person may qualify as an expert witness on the issue of whether a health care provider such as a nurse practitioner departed from accepted standards of medical care if the person (1) is practicing in a field that involves the same type of care or treatment as that delivered by the defendant health care provider, (2) has knowledge of the accepted standards of care for the care or treatment of the illness, injury, or condition involved in the claim, and (3) is qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of health care. TEX. CIV. PRAC. & REM. CODE § 74.402(b). Section 74.401 sets out similar requirements for an expert witness in a suit against a physician, with the additional requirement that the expert must be a physician who was practicing medicine at the time the claim arose. *See* TEX. CIV. PRAC. & REM. CODE § 74.401(a).

Relying on *Erlich v. Miles*, 144 S.W.3d 620, 624–26 (Tex. App.—Fort Worth 2004, pet. denied), Copley argues that "Dr. Blair fails to demonstrate his qualifications to opine to . . . preoperative, intraoperative, and postoperative issues" such as what steps should be taken "to assess a patient's stability or instability for surgery," and "what should be considered in determining what, if any, consults from other specialties should be obtained." In *Erlich*, the court concluded a neurologist was not qualified to submit an expert report on the validity of surgical procedures used by a plastic surgeon for a face lift and cheek implants. *Id.* at 625. The court explained that "[n]othing in the expert report . . . indicates that [the expert] is familiar with either the surgical procedures used by Appellee for the face lift and implants or with the

–10–

preoperative procedures used by Appellee to prepare Appellant's face for the face lift and implants." *Id.* at 625–26.

In *Foster v. Richardson*, 303 S.W.3d 833, 845 (Tex. App.—Fort Worth 2009, no pet.), the court distinguished its earlier opinion in *Erlich* in concluding that an internist was qualified to opine regarding an orthopedic surgeon. The court in *Foster* explained, "[t]his case is different from *Erlich* . . . because [the expert] has shown experience with the exact issue involved" in the plaintiff's claim against the defendant doctor. *Id.* The report did not "assess blame on Dr. Foster for processes involved with an orthopedic surgery." *Id.* Instead, the report addressed Dr. Foster's failure to follow orthopedic diagnostic procedures that would have allowed him to correctly diagnose the plaintiff's broken ankle and thus avoid the continued pain associated with an incorrect diagnosis. *Id.* Because the expert's report established his qualifications to speak to orthopedic diagnostic procedures, he was qualified to provide an opinion on causation. *Id.*

Similarly, Blair does not "assess blame" on Copley "for processes involved with an orthopedic surgery," *see id.*, but rather speaks to Copley's actions as "an orthopedic surgeon acting in his role as an attending physician to a hospitalized patient needing, and having, orthopedic surgery." Blair specifically states that as a pediatrician, he regularly interacts with surgeons when his patients require surgical care, participates in ensuring that patients needing surgery are medically clear for it, and consults with surgeons "when they have discovered or become aware that a patient has a medical condition outside of their area of specialization that requires further medical evaluation or consultation." Blair explains, "I am familiar with the standard of care applicable to the surgeon . . . involved in the process of obtaining pre-surgical medical clearance for a patient, or who encounter[s] an unexpected, incidental or reported finding of medical significance that requires further medical management or follow up evaluation or care." Blair explicitly speaks to Copley's role "first and foremost [as] a medical

doctor." He states that "as a medical doctor, Dr. Copley should or would have an appreciation for the significance of an enlarged aorta, particularly in a case involving a patient who has suffered multiple focal, blunt trauma injuries." Blair continues, "[Copley] would know that this is a serious and ominous finding and he would fully appreciate the significance of a prior, written recommendation for follow up by a pediatric cardiologist, as set forth in a prior hospitalization discharge summary."

We conclude that as in *Foster*, Blair has shown experience with the issue involved in appellees' claims against Copley, that is, the failure to ensure that Jessica received a pediatric cardiology consultation either before or after her orthopedic surgery. We overrule Copley's issue challenging Blair's qualifications to opine on the standard of care applicable to Copley.

We also conclude that Blair is qualified to address the standard of care for the nurse practitioners. In *Baylor Medical Center at Waxahachie v. Wallace*, 278 S.W.3d 552, 558 (Tex. App.—Dallas 2009, no pet.), we stated, "if the physician states he is familiar with the standard of care for both nurses and physicians, and for the prevention and treatment of the illness, injury or condition involved in the claim, the physician is qualified on the issue of whether the health care provider departed from the accepted standards of care for health care providers." As in *Baylor Medical Center*, Blair's report includes his specific statement that he has worked with nurse practitioners and is familiar with the standards of care that apply to nurse practitioners in similar situations. *See id.* at 559. He also states that he has trained and supervised nurse practitioners. He specifies that he has experience with nurse practitioners in the same circumstances as presented here, in "a hospital, where . . . nurse practitioners have been called upon to evaluate a patient who has complex medical issues or who has encountered a significant medical finding outside of his or her area of practice." The trial court did not abuse its discretion when it concluded Blair was qualified to render a report against the nurse practitioner appellants. *See id.*

–12–

We overrule the issues of Holland, Kines, and Thornton challenging Blair's qualifications to address the standards of care for nurse practitioners.

*Qualifications to opine on causation*

We also conclude Blair sufficiently established his qualifications to opine regarding causation. Under Chapter 74, a person is qualified to give opinion testimony concerning the causal relationship between the injury, harm, or damages claimed and the alleged departure from the applicable standard of care only if the person is a physician and is otherwise qualified to render opinions on the causal relationship under the Texas Rules of Evidence. TEX. CIV. PRAC. & REM. CODE § 74.403(a); 74.351(r)(5)(C). To be qualified under the rules of evidence, an expert witness must have "knowledge, skill, experience, training or education regarding the specific issue before the court." *See* TEX. R. EVID. 702. As stated in *Estorque v. Schafer*, 302 S.W.3d 19, 26 (Tex. App.—Fort Worth 2009, no pet.), "[t]he proper inquiry in assessing a doctor's qualifications to submit an expert report is not his area of expertise but his familiarity with the issues involved in the claim before the court."

Appellants contend that because Blair is not an expert in the treatment of an enlarged aorta, he is not qualified to offer an opinion that failure to treat Jessica's enlarged aorta caused her death from an aortic dissection. Blair concedes he is not a pediatric cardiologist. But he explains in his report that he "know[s] what an enlarged aorta is" and has "been involved in the diagnosis and treatment of the same." He states that he is familiar with "the generally available diagnostic and treatment modalities for an enlarged aorta," and "the consequences of not diagnosing or treating an enlarged aorta, in particular one that is progressively enlarging." He explains that even when a patient having an enlarged aorta has been referred to a pediatric cardiologist for consultation or treatment, he actively continues to follow the patient or participates in the delivery of treatment. As will be discussed below, Blair's report further

–13–

details his knowledge of the treatment available for an enlarged aorta and the consequences of failing to treat the condition.

We also observe that appellees' negligence issues against appellants relate to appellants' failure to refer Jessica to a pediatric cardiologist for treatment, not any injury relating to treatment they provided for an enlarged aorta. *See Estorque*, 302 S.W.3d at 26 (specialized branches of medicine not implicated by defendant's alleged negligence in failing to refer plaintiff to specialists for problems revealed in CT scan). Blair explains that he is routinely "engaged in caring for children with complex medical issues" and states he has "dealt with throughout my own practice" the transfer and receiving of patients from one medical facility to another. He explains he is familiar with the standards of care relating to hospital-to-hospital transfers such as Jessica's, as well as the standards of care for health care professionals "who encounter an unexpected, incidental or reported finding of medical significance that requires further medical management or follow up evaluation and/or care." And for each appellant, Blair identified the action that should have been taken and described the circumstances under which the opportunity arose for each appellant to ensure that Jessica obtained a consultation with a pediatric cardiologist.

We discussed whether an expert was qualified to render opinions on causation in *Pediatrix Medical Group, Inc. v. Robinson*, 352 S.W.3d 879, 887–89 (Tex. App.—Dallas 2011, no pet.). In *Pediatrix*, the plaintiffs alleged that a premature infant had become blind because his medical providers failed to conduct timely follow-up examinations or provide treatment for retinopathy of prematurity (ROP). *See id.* at 882. The defendants challenged the qualifications of a neonatologist to offer an opinion about causation. *Id.* at 887. They argued that her training and experience as a neonatologist did not "provide her sufficient expertise to opine that the cause of [the infant's] blindness was the untimely diagnosis and treatment for ROP." *Id.* They also

–14–

argued that her report failed to establish that "she had knowledge, either from experience or study, concerning the effectiveness of ROP treatments in general or in [the infant's] particular case." *Id.* We disagreed:

> [W]e conclude [the expert's] report establishes her qualifications to opine on causation. While she is not a pediatric ophthalmologist specializing in the diagnosis and treatment of ROP, the causation issue here relates to the duty of the neonatologists to have recognized the potential for Ruben to develop ROP, to have worked closely with [the doctor who first examined Ruben's eyes] regarding Ruben's treatment, to have recognized the potential harm for a delay in follow-up appointments, and to have taken the appropriate actions to ensure Ruben was seen by an appropriate doctor during the critical time frame. Based on her treatment of small preterm babies like Ruben, her experience in requesting ophthalmologic consultations to screen preterm babies for ROP, and her familiarity with implementing policies and procedures to ensure proper care for babies at risk for ROP, she is qualified to provide her expert opinion.

*Id.* at 889.

We also addressed an expert's qualifications to opine on causation in *Mosely v. Mundine*, 249 S.W.3d 775, 779–80 (Tex. App.—Dallas 2008, no pet.). In *Mosely*, Mundine was evaluated in a hospital emergency room by a doctor after a car accident. *Id.* at 777. The doctor ordered a chest x-ray and evaluated it as normal. But a radiologist also reviewed the chest x-ray, noted a one-centimeter-sized nodule on Mundine's upper right lung, and informed the emergency department of the abnormality. Mundine was not notified. About two years later, another visit to the hospital revealed a five- to six-centimeter-sized mass on her upper right lung that required surgery and chemotherapy. *Id.* Mundine's expert opined that "[h]ad this cancer been detected in 2004[,] the likelihood of survival for Mrs. Mundine would have been significantly greater with a much less invasive treatment protocol." *Id.* at 780. The doctor argued the expert was not qualified to render an opinion as to causation because he was an emergency physician and internist, not an oncologist. *Id.* at 779. We rejected this argument, explaining that "[t]he conduct

–15–

causing the Mundines' injuries related to the ability of an emergency room physician to interpret a routine chest x-ray and identify an abnormality, not the diagnosis and treatment of cancer." *Id.* We concluded, "[t]he record shows the trial court could have concluded the Mundines met their burden to prove [the expert] had the knowledge, skill, experience, training, or education regarding that specific emergency room physician's scope of practice." *Id.*

Appellants' challenges to Blair's qualifications to opine as to causation are very similar to those we addressed in *Pediatrix* and in *Mosely*. In both cases, as here, the expert in question was not a specialist in the disease or condition suffered by the patient. *See Pediatrix*, 352 S.W.3d at 889 (expert was neonatologist, not pediatric ophthalmologist, where patient suffered ROP); *Mosely*, 249 S.W.3d at 779 (expert was emergency physician and internist, not oncologist, where patient suffered cancer). In both cases, as here, the expert addressed failures to recognize potential harm and take appropriate actions. *See Pediatrix*, 352 S.W.3d at 889 (defendants should have recognized potential harm of delay in scheduling follow-up appointments); *Mosely*, 249 S.W.3d at 779 (failure to identify abnormality in routine x-ray). In both cases, as here, the expert opined that the delay caused by the defendants' failures resulted in greater injury to the patient. *See Pediatrix*, 352 S.W.3d at 889 (lack of treatment for ROP caused blindness); *Mosely*, 249 S.W.3d at 780 (expert opined that delayed diagnosis of cancer required invasive and aggressive treatment and shortened life expectancy). Here, as in *Pediatrix* and *Mosely*, the record is sufficient to establish Blair's qualifications to opine on causation. *See Pediatrix*, 352 S.W.3d at 889; *Mosely*, 249 S.W.3d at 780. We overrule appellants' issues challenging Blair's report on this ground.

*Adequacy of report as to causation*

Appellants assert that Blair's report was impermissibly speculative and conclusory in describing any causal relationship between any breach by any appellant and Jessica's death. To

meet the requirements of chapter 74, Blair's report must "provide information linking the defendant's purported breach of the standard of care to the plaintiff's injury." *Fagadau v. Wenkstern*, 311 S.W.3d 132, 138 (Tex. App.—Dallas 2010, no pet.). The report "must contain sufficiently specific information to demonstrate causation beyond mere conjecture." *Id.*

Appellants contend Blair fails to connect Jessica's 2006 condition, an enlarged aorta, with her death two years later from a different condition, a ruptured aorta. Blair states, "it is my opinion that Jessica's aortic enlargement was a progressively worsening condition following its being discovered while she was a patient at Kapi'olani Medical Center . . . . [T]he aortic rupture ultimately occurred due to lack of intervention and available care. It is my opinion that the initial dilatation of her aorta and the apparent progressive worsening of that condition over time would have been treatable medically initially, and surgically subsequently, as the aorta continued to dilate." He opines that each appellant's breach of the standards of care, which he specifically details, caused or contributed to "the ultimate outcome of the rupture of the aorta, and the otherwise preventable, untimely death of Jessica Durham." He explains the actions that should have been taken: "If a pediatric cardiology consultation and related evaluation and medical treatment (including but not limited to drug therapy and surgery) had been provided to Jessica or arranged for by any of the [appellants] . . . all of whom were in a position to deliver or arrange for the timely delivery of same, the enlarged aorta would have been treatable, and Jessica's death would have been prevented." He explains the nature of the treatment that should have been provided: "if . . . [appellants] had requested or arranged for consultation by a pediatric cardiologist, I am certain that an echocardiographic study (and/or an MRI) would have been performed and appropriate follow up and potential treatment could and almost certainly would have been rendered to forestall further aortic dilation, mitigating the risk of rupture or tamponade, or surgical intervention (such as an aortic graft) to replace the dilated segment of the

–17–

aorta, would have occurred, which ultimately is the standard of care for children with progressive aortic dilation . . . ." He concludes, "[t]his type of treatment and intervention (among others that might be available), in my opinion and in my experience, would have prevented Jessica's ultimate dissection and subsequent death."

We conclude that Blair's report provides adequate information linking the appellants' purported breaches of the standards of care to Jessica's injury. *See Fagadau*, 311 S.W.3d at 138. Blair adequately explains the basis of his statements and links his conclusions to the facts. *See Bowie Mem'l Hosp.*, 79 S.W.3d at 52. He also links appellants' conduct to the harm alleged. *See Potts*, 392 S.W.3d at 630. He states that because Jessica's enlarged aorta was never treated, it ruptured and she died. He opines that the failure to obtain treatment was the result of appellants' breaches of the applicable standards of care. At trial, appellees may be unable to prove causation. Other experts may provide opposing opinions to support negative findings by a jury. But "the fact that [appellees] may not prove causation at trial does not make [Blair's] report inadequate." *See Fagadau*, 311 S.W.3d at 139. Blair's report is not conclusory. He describes what each appellant should have done and what happened because he or she failed to do it. *Id.* As we stated in *Fagadau*, "[a]s such, the report clearly constitutes a good faith effort to provide a fair summary of [the expert's] opinions on causation." *Id.* Blair states that he offers his opinions "with a reasonable degree of medical certainty and/or reasonable degree of medical probability," and opines that Jessica's "ultimate aortic dissection and subsequent death" would not have occurred absent appellants' breaches of the standards of care. We conclude the report sufficiently informs appellants of the specific conduct appellees have called into question. *See Palacios*, 46 S.W.3d at 879. We further conclude that the report provides a basis for the trial court to conclude that appellees' claims have merit. *See id.* We overrule appellants' issues.

In one issue, appellees complain that the trial court erred by dismissing their direct claims against CMC because Blair's report "provided a fair and adequate summary of the deviations from the appropriate standard of care" by CMC. The trial court's order granting CMC's motion to dismiss these claims recited:

> Dr. Blair's opinions on pages 8 and 10 of his September 27, 2011 report allege multiple deviations from the appropriate standard of medical care by Children's Medical Center of Dallas. His opinions, though, are conclusory, with no attempt to explain the facts upon which he uses to arrive at these opinions. This is not the "fair summary" required of a Chapter 74 expert report. Dr. Blair's cursory treatment of the claims against Children's Medical Center of Dallas differs significantly from the more factually-detailed opinions he gave regarding other Defendants in this cause.

The trial court's order, however, provided that "[t]he respondeat superior claims of Plaintiffs against Defendant Children's Medical Center of Dallas are not affected by this dismissal."

Since the date of the trial court's order, the Texas Supreme Court has issued opinions in *Potts* and in *TTHR*. *See Potts*, 392 S.W.3d 625; *TTHR*, 56 Tex. Sup. Ct. J. 467. In these cases, the court "held that an expert report satisfying the requirements of the [Texas Medical Liability Act] as to a defendant, even if it addresses only one theory of liability alleged against that defendant, is sufficient for the entire suit to proceed against the defendant." *TTHR*, 56 Tex. Sup. Ct. J. at 467 (citing *Potts*, 392 S.W.3d at 630). Because Blair's report satisfied the requirements of chapter 74 as to CMC's vicarious liability for the allegedly negligent actions of the nurses, Holland, Kines, and Thornton, appellees' direct liability claims against CMC may proceed as well. *See id.* (because plaintiff's expert reports satisfied statutory requirements as to her claim that hospital was vicariously liable for actions of nurses, plaintiff's direct liability claims could proceed as well). In light of the court's holdings in *Potts* and *TTHR*, we sustain appellees' sole

issue in its cross appeal, and reverse the portion of the trial court's order dismissing appellees' claims of negligence against CMC.

### CONCLUSION

We overrule appellants' issues asserting that the trial court erred by denying their motions to dismiss. We sustain appellees' issue in their cross-appeal. We affirm the trial court's order of May 1, 2012, denying the motions to dismiss of nurses Holland, Thornton, and Kines, and doctors Rupp, Hieber, and Copley. We affirm the trial court's order of May 4, 2012, insofar as it denies CMC's motion to dismiss appellees' vicarious liability claims, and reverse the portion of the order granting CMC's motion to dismiss appellees' direct liability claims.

/Mary Murphy/
MARY MURPHY
JUSTICE

120681F.P05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

CHILDREN'S MEDICAL CENTER OF
DALLAS, AMY HOLLAND, CPNP,
DAVID W. KINES, FNPC, LAWSON
COPLEY, M.D., J. PATRICK HIEBER,
M.D., LORI A. THORNTON, RN, FNPC,
and TIMOTHY J. RUPP, M.D., Appellants

No. 05-12-00681-CV      V.

SHERI DURHAM and DENISE JENKINS,
AS ADMINISTRATOR OF THE ESTATE
OF JESSICA HALEY DURHAM,
Appellees

On Appeal from the County Court at Law
No. 4, Dallas County, Texas
Trial Court Cause No. CC-11-01231-D.
Opinion delivered by Justice Murphy.
Justices Francis and Evans participating.

In accordance with this Court's opinion of this date, we **REVERSE** the portion of the trial court's judgment dismissing with prejudice appellees' direct liability negligence claims against appellant Children's Medical Center of Dallas. The judgment of the trial court is **AFFIRMED** in all other respects. We **REMAND** this cause to the trial court for further proceedings.

It is **ORDERED** that appellees Sheri Durham and Denise Jenkins, as Administrator of the Estate of Jessica Haley Durham, recover their costs of this appeal from appellants Children's Medical Center of Dallas, Amy Holland, CPNP, David W. Kines, FNPC, Lawson Copley, M.D., J. Patrick Hieber, M.D., Lori A. Thornton, RN, FNPC, and Timothy J. Rupp, M.D.

Judgment entered this 31st day of May, 2013.

/Mary Murphy/
**MARY MURPHY**
**JUSTICE**

–21–