Opinion issued May 28, 2026



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-24-00681-CV

————————————

**HEE-SOOK CHEON, NP, Appellant**

**V.**

**SCOTT KNOWLES, INDIVIDUALLY AND AS PERSONAL
REPRESENTATIVE OF THE ESTATE OF
CAROLYN MARIE KNOWLES, DECEASED, Appellee**

---

**On Appeal from the 129th District Court
Harris County, Texas
Trial Court Case No. 2022-76046**

---

**MEMORANDUM OPINION**

This appeal arises from a trial court's denial of a motion to dismiss a health-care-liability claim for the failure to file an adequate medical-expert report under the Texas Medical Liability Act (TMLA).[1]

Scott Knowles sued various health care providers after his mother, Carolyn, developed pressure ulcers during inpatient care and later died from sepsis. This interlocutory appeal[2] concerns his claim against a nurse practitioner, Hee-Sook Cheon, NP, for her role in Carolyn's care. The issue presented is whether Knowles's expert report adequately addressed the requisite statutory elements—the standard of care, breach, and causation.

We conclude that the expert report is sufficient to satisfy the TMLA. Therefore, we affirm the trial court's denial of the motion to dismiss the claim.

**Background**

According to the petition and expert report filed in this case, Carolyn was admitted to HCA Houston Healthcare Northwest hospital for various health concerns, including heart failure, peripheral arterial disease, and a blood clot in her left leg.

---

[1] *See* TEX. CIV. PRAC. & REM. CODE §§ 74.001(a)(13), 74.351(a), (*l*), (r)(6).

[2] *See id.* § 51.014(a)(9).

Carolyn was later transferred to Encompass Health Rehabilitation Hospital for inpatient care. She arrived with a necrotic[3] wound on her left leg and erythema (redness) on her heels. "During her stay, the deep tissue injuries progressed."

On December 18, 2020, Carolyn was transferred to Crimson Heights Health and Wellness. Upon admission, a nurse documented "two open areas" on Carolyn's "lower left leg/heel," "two small black areas over the bottom of [her] left heel," and "blackness" on two of her left toes. The nurse "notified Sue Heesook, N.P." And orders for wound care were "initiated" on December 21 and 22. There was also a standing order to obtain a consultation from a podiatrist as needed.

Cheon, a nurse practitioner at Crimson, provided care to Carolyn on December 22 and 24. But, Cheon made "no mention[] of wounds in her notes." Rather, she documented only a need to "address balance [and] pressure ulcer prevention."

Three days later, Knowles discovered that Carolyn was lethargic and confused. He had her transferred to HCA Houston Healthcare Kingwood hospital.

Carolyn arrived at the hospital "with an open wound to her [left] Achilles" tendon, "gangrenous changes to her toes," ulcers on both heels, and complaining of pain. She was admitted to the telemetry unit with an "altered mental status, acute

---

[3]     Necrosis refers to the "[p]athologic death of one or more cells, or of a portion of tissue or organ, resulting from irreversible damage. . . ." *Necrosis*, STEDMAN'S MEDICAL DICTIONARY 589570, Westlaw (database updated Nov. 2014).

3

stroke, cellulitis[] of [left] ankle, [and] encephalopathy." And antibiotics were started. A podiatrist examined her the next day for "left foot gangrene and cellulitis." He charted ulceration to her left ankle with an exposed Achilles tendon and necrotic eschar. Additionally, her left heel was necrotic, her left toes were black, and her right forefoot was "pregangrenous."

On January 2, 2021, Carolyn underwent wound debridement, during which "50% width of the Achilles tendon was removed." Wound cultures grew Acinobacter and Methicillin-resistant Staphylococcus aureus (MRSA).

Thereafter, Carolyn's condition continued to decline. She died on January 9, 2021. Her death certificate lists her cause of death as "septic shock with multiorgan dysfunction syndrome."

Subsequently, Knowles sued the health care facilities[4] and Cheon for negligence. To support his claims, Knowles served them with a medical expert report authored by Rabee Korbaj, M.D.

In his supplemental report,[5] Dr. Korbaj states that he is a licensed physician and board certified in internal medicine. He practices full time in internal medicine

---

[4]    Knowles sued HCA Houston Healthcare Northwest, HCA Houston Healthcare Kingwood, Encompass Health Rehabilitation Hospital, and Crimson Heights Health and Wellness. These defendants are not parties to this appeal.

[5]    The trial court sustained Cheon's objections to Knowles's original expert report and granted Knowles an extension to cure the deficiency. *See* TEX. CIV. PRAC. & REM. CODE § 74.351(c). And Knowles filed a supplemental report. For the reasons discussed below, we conclude that Dr. Korbaj's supplemental report is sufficient on

and treats geriatric patients in hospitals, rehabilitation centers, and long-term healthcare facilities. He has served as the medical director of assisted-care and nursing-home facilities.

Further, Dr. Korbaj is a preceptor in the Chamberlain University Nurse Practitioners Program. He trains, supervises, and evaluates nurse practitioners on performing regular wound checks, identifying wound development and sepsis, and recognizing when to obtain higher consultations. And he is knowledgeable about the standard of care applicable to nurse practitioners.

Dr. Korbaj states that he reviewed Carolyn's medical records from the HCA hospitals, Encompass, and Crimson. And he has extensive experience with the diagnostic evaluations, procedures, and complications at issue in this case—including bedsore-protection and wound-prevention methods, wound care, the diagnosis and treatment of sepsis, and the risk of death from sepsis.

As discussed below, Dr. Korbaj opines with respect to Cheon that the standard of care applicable to a nurse practitioner caring for a patient with necrotic wounds is to order appropriate higher medical consults. He opines that Cheon breached the applicable standard of care by failing to order a consultation for Carolyn with a podiatrist or vascular surgeon.

---

its own. Because his original report is not material to the outcome, we confine our analysis to the supplement. *See Durrani v. Ayala*, No. 14-19-00950-CV, 2021 WL 97813, at *5 (Tex. App.—Houston [14th Dist.] Jan. 12, 2021, no pet.) (mem. op.).

Dr. Korbaj concludes that, "[w]hile in the care of NP Cheon[,] . . . it is undisputable that [Carolyn's] pressure injuries worsened." And the deterioration was "due to the lack of wound care" and "lack of appropriate wound care consults, like vascular or podiatry." He opines that "[i]t is more likely than not that [Carolyn's] necrotic ulcer and necrotic Achilles were the cause of [her] sepsis, which is also supported by the diagnosis of cellulitis and the wound cultures that grew Acin[et]obacter and MRSA." And, but for the breach of the standard of care by Cheon, "it is more likely than not and within a reasonable degree of medical probability that [Carolyn's] wounds would not have worsened, become infected, her Achilles would not have necrosed, she would not have developed sepsis, and would not have died."

Cheon moved to dismiss Knowles's claim against her on the ground that Dr. Korbaj's report did not adequately address the standard of care, breach, and causation. After a hearing, the trial court denied Cheon's motion.

## Expert Report

Cheon argues on appeal that the trial court erred in denying her motion to dismiss the claim against her because Knowles failed to present an expert report that adequately addresses the standard of care, breach, and causation. We disagree.

6

## A. Standard of Review and Law

We review a trial court's decision on a defendant's motion to dismiss based on the adequacy of an expert report for an abuse of discretion. *Bush v. Columbia Med. Ctr. of Arlington Subsidiary, L.P.*, 714 S.W.3d 536, 544 (Tex. 2025). A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner, without reference to guiding rules or principles. *Jelinek v. Casas*, 328 S.W.3d 526, 539 (Tex. 2010). A trial court does not abuse its discretion merely because it decides a discretionary matter differently than an appellate court would. *Harris Cnty. Hosp. Dist. v. Garrett*, 232 S.W.3d 170, 176 (Tex. App.—Houston [1st Dist.] 2007, no pet.). "As with many discretionary decisions, [c]lose calls must go to the trial court." *Bush*, 714 S.W.3d at 544 (internal quotations omitted).

The TMLA requires a health-care-liability claimant to timely serve each defendant health care provider with an expert report. *See* TEX. CIV. PRAC. & REM. CODE § 74.351(a). The expert's written report must "provide[] a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the . . . health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed." *Id.* § 74.351(r)(6).

A trial court may grant a motion challenging the adequacy of an expert report if it appears to the court, after a hearing, that the report does not represent an

7

objective "good faith effort" to provide the required "fair summary" of the applicable standard of care, the defendant's breach, and how that breach caused the ultimate injury. *Bush*, 714 S.W.3d at 543; *see* TEX. CIV. PRAC. & REM. CODE § 74.351(*l*), (r)(6). A report constitutes a "good-faith effort" if it (1) informs the defendant of the specific conduct called into question and (2) provides a basis for the trial court to conclude that the claims have merit. *Bush*, 714 S.W.3d at 543.

In assessing the adequacy of a report, a trial court may not draw inferences but must rely exclusively on the information within the four corners of the report. *See Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002). And it "must view the report in its entirety, rather than isolating specific portions or sections." *Baty v. Futrell*, 543 S.W.3d 689, 694 (Tex. 2018) (citing *Austin Heart, P.A. v. Webb*, 228 S.W.3d 276, 282 (Tex. App.—Austin 2007, no pet.) ("The form of the report and the location of the information in the report are not dispositive.")). "No particular words or formality are required." *Bush*, 714 S.W.3d at 543 (internal quotations omitted). And the report need not marshal all the plaintiff's proof. *Id.* But the expert must explain the basis of his statements and link his conclusions to the facts. *Wright*, 79 S.W.3d at 52. "[W]hether the expert's explanation is credible, reasonable, or believable is irrelevant; those questions are to be litigated later in the proceedings." *Bush*, 714 S.W.3d at 545.

Ultimately, "[a]t this threshold stage of the case, the adequacy of an expert report is measured by a lenient standard." *Id*. at 543. The standard is met if the report "includes all the required elements, and . . . explains their connection to the defendant's conduct in a non-conclusory fashion." *Id.* (internal quotations omitted). "[T]he purpose of this low threshold is to weed out frivolous malpractice claims, not to adjudicate potentially meritorious claims." *Id.* (internal quotations omitted).

## B.     Analysis

### 1.     *Standard of Care and Breach*

An expert report must set forth the standard of care applicable to the particular type of health care provider named as a defendant. *See Children's Med. Ctr. of Dallas v. Durham*, 402 S.W.3d 391, 396 (Tex. App.—Dallas 2013, no pet.). The standard of care pertinent to Cheon is defined by what an "ordinarily prudent [nurse practitioner[6]] would do under the same or similar circumstances." *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 880 (Tex. 2001). "An expert report adequately articulates the standard of care and breach when it sets forth

---

[6]     According to Cheon, Crimson does not employ nurse practitioners or physicians. Rather, she is an independent nurse practitioner who performs patient care at Crimson as part of a "rounding internal medicine service." A nurse practitioner, or "advanced practice nurse," is a registered nurse with advanced education, training, and licensure. *See* 22 TEX. ADMIN. CODE §§ 221.1–221.4; *see also* TEX. OCC. CODE § 301.152. A nurse practitioner "retains professional accountability for advanced practice nursing care" and "acts independently and/or in collaboration with the health team in the observation, assessment, diagnosis, intervention, evaluation, rehabilitation, care and counsel" of patients. 22 TEX. ADMIN. CODE § 221.13(c), (e).

specific information about what the defendant should have done differently; that is, what care was expected and not given." *Bush*, 714 S.W.3d at 544 (internal quotations omitted).

Dr. Korbaj opines that "the standard of care requires that . . . practitioners like [Cheon] order the appropriate medical consults like vascular surgery and podiatry." According to Dr. Korbaj, "[a]ny reasonable and prudent NP [nurse practitioner] . . . caring for a patient with a necrotic and painful Achilles wound would have ordered one." And, "as the practitioner rounding on [Carolyn], NP Cheon had the duty and responsibility to order such a consult, as this is the standard of care."

Thus, Dr. Korbaj identifies the pertinent standard of care applicable to a nurse practitioner like Cheon in providing care to a patient with a necrotic wound. *See* TEX. CIV. PRAC. & REM. CODE § 74.351(r)(6); *Durham*, 402 S.W.3d at 396. And he states his conclusions in terms of what an ordinarily prudent nurse practitioner would do under the same or similar circumstances. *See Palacios*, 46 S.W.3d at 880.

Cheon argues that Dr. Korbaj's report is inadequate because it presents only "collective assertions" that "lump together multiple defendants from different practice areas" and fails to state a standard of care specific to Cheon.

But grouping defendants together under the pertinent standard of care does not render an expert report inadequate where the report also specifically names the defendant health care provider. *Sanjar v. Turner*, 252 S.W.3d 460, 466–67 (Tex.

10

App.—Houston [14th Dist.] 2008, no pet.). Here, Dr. Korbaj specifically identifies Cheon in his report and states the standard of care applicable to her as a nurse practitioner.

With respect to the breach element, Dr. Korbaj opines that "[t]he failure of NP Cheon to order a podiatry consult or vascular consult to evaluate [Carolyn's] wounds was a breach in the standard of care." And he explains the basis of his conclusions and links them to the facts. *See Wright*, 79 S.W.3d at 52.

Dr. Korbaj discusses Carolyn's medical history between the day she was admitted to Crimson and the day she was transferred to HCA Kingwood hospital. Specifically, Dr. Korbaj notes that Carolyn was admitted to Crimson on December 18, 2020, with just "two open areas" on her "lower left leg/heel," "two small black areas" on her left heel, and "blackness" on her left toes. The nurse "notified Sue Heesook, N.P.," whom the trial court might have reasonably concluded was Cheon. "Orders were written for wound care" on December 21 and 22. And there was a standing order to obtain a consultation from a podiatrist as needed.

According to Dr. Korbaj, Cheon was responsible for Carolyn's care on December 22 and 24. But "the records do not indicate wound care was performed" or that a consultation was ordered. Rather, Cheon made "no mentions of wounds" in her December 22 notes. And, on December 24, she documented only that

11

measures for balance and "pressure ulcer prevention" were needed and that Carolyn was on an air mattress.[7]

Three days later, Carolyn was so lethargic and confused while at Crimson that Knowles had her transferred to HCA Kingwood hospital. She arrived "with an open wound to her [left] Achilles" tendon, "gangrenous changes to her toes," ulcers on both heels, and complaining of pain. She was admitted to the telemetry unit with an "altered mental status, acute stroke, cellulitis[] of [left] ankle, [and] encephalopathy." And antibiotics were started. A podiatrist examined her the next day for "left foot gangrene and cellulitis." He found her left ankle ulcerated to the point that her Achilles tendon was exposed. And her left heel was necrotic, her left toes were black, and her right forefoot was "pregangrenous."

Dr. Korbaj concludes that "[i]t is clear based on the records from [Crimson] and the subsequent records from HCA Kingwood [that] the wounds deteriorated" while Carolyn was at Crimson. He infers from the lack of any documented wound care or order for consultation with a podiatrist, and the condition of Carolyn's wounds and health when she arrived at the hospital, that no wound care or consultation was ordered. He opines that "[a] nurse practitioner acting in the proper standard of care would have ensured that [Carolyn] had a consult."

---

[7]    Dr. Korbaj explains that "special mattresses" are used when a patient with limited mobility is susceptible to developing bedsores.

Section 74.351 does not prohibit experts from making inferences based on medical history and lack of documented care. *See New Med. Horizons, II, Ltd. v. Milner*, 575 S.W.3d 53, 68 (Tex. App.—Houston [1st Dist.] 2019, no pet.) (expert "infer[red] the standard-of-care breaches from the lack of documentation in the medical records and the gangrenous condition" of wound).[8] Whether Dr. Korbaj's factual inferences in the report are accurate are questions to be litigated later in the proceedings and are not to be considered when ruling on a section 74.351 motion to dismiss. *See Bush*, 714 S.W.3d at 545.

In *Milner*, a diabetic patient underwent surgery on an infected foot at a medical center. 575 S.W.3d at 58. In the days after, there was little or no documented wound care or physician follow-up. *Id.* at 59. When the patient's daughter arrived during discharge, it was discovered that the patient's foot had deteriorated into a

---

[8]  *See also Magnolia Place Health Care, L.L.C. v. Jackson*, No. 09-20-00266-CV, 2021 WL 6138801, at *11–12 (Tex. App.—Beaumont Dec. 30, 2021, no pet.) (mem. op.) (expert inferred from nursing home patient's extensive pressure ulcer with exposed tailbone found upon admission to hospital that nursing home failed to provide care); *Clavijo v. Fomby*, No. 01-17-00120-CV, 2018 WL 2976116, at *10 (Tex. App.—Houston [1st Dist.] June 14, 2018, pet. denied) (mem. op.) (expert inferred from lack of documented wound evaluation that such did not occur); *Hood v. Kutcher*, No. 01-12-00363-CV, 2012 WL 4465357, at *5–6 (Tex. App.—Houston [1st Dist.] Sept. 27, 2012, no pet.) (mem. op.) (expert inferred from lack of documented wound care and subsequent condition of wound that "thorough wound exploration and cleaning was not performed"); *Quinones v. Pin*, 298 S.W.3d 806, 813 (Tex. App.—Dallas 2009, no pet.) (expert relied on silence of medical records to support inference under breach element); *Granbury Minor Emergency Clinic v. Thiel*, 296 S.W.3d 261, 265 (Tex. App.—Fort Worth 2009, no pet.) ("[S]ection 74.351 does not prohibit experts, as opposed to courts, from making inferences based on medical history.").

gangrenous infection—which later necessitated the amputation of her great toe. *Id.* The patient sued the medical center and served it with an expert report. *Id.* The expert opined that the center's nursing staff breached the standard of care by failing to timely provide wound care and failing to report the declining condition of the wound to physicians. *Id.* at 67.

The medical center argued that the expert's opinion on the applicable standard of care and its breach "lack[ed] the specificity and detail required to satisfy the fair-summary standard." *Id.* Namely, the expert failed to answer: "What is timely under the circumstances? What sort of wound care should the nurses have provided? How often should the [center's] staff have been assessing the wound? *Who should have reported the wound's condition to the physicians, and when should they have reported it*?" *Id.* at 68 (emphasis added).

This Court concluded in *Milner* that such additional detail was "simply not required at this stage of the proceedings." *Id.* (quoting *Baty*, 543 S.W.3d at 697 & n.10). The expert "infer[red] the standard-of–care breaches by the lack of documentation in the medical records and the gangrenous condition" of the wound. *Id.* And his conclusions were "supported by his statement that, from the medical records, 'there appear[ed] to have been little or no documented wound care or follow-up of the condition of the wound'" after surgery and by the fact that the patient's wound had become gangrenous days later—which was discovered by her

14

family. *Id.* We held that the expert report adequately advised the medical center of the conduct the patient called into question and gave the trial court a sufficient basis to reasonably conclude that the claims had merit. *Id.*

Here, similarly, Dr. Korbaj explains the basis of his conclusions with respect to Cheon's breach of the standards he articulated, and he states what Cheon should have done differently. *See id.*; *see also Palacios*, 46 S.W.3d at 880.

Cheon complains that Dr. Korbaj's report is conclusory because he provides "no explanation of when [she] should have sought a consult." But, as in *Milner*, such additional detail is "simply not required at this stage of the proceedings." 575 S.W.3d at 68; *see also Abshire v. Christus Health Se. Tex.*, 563 S.W.3d 219, 227 (Tex. 2018) (expert reports sufficient without designation of specific procedures that should have been used). An expert's statement is conclusory only if he "asserts a conclusion with *no basis or explanation*." *Windrum v. Kareh*, 581 S.W.3d 761, 768 (Tex. 2019) (emphasis added).

Considering Dr. Korbaj's report in its entirety, the trial court reasonably concluded that it represents a good-faith effort to provide a fair summary of the applicable standard of care and the manner in which Cheon breached that standard. *See* TEX. CIV. PRAC. & REM. CODE § 74.351(r)(6); *Bush*, 714 S.W.3d at 543–44; *Baty*, 543 S.W.3d at 694; *Milner*, 575 S.W.3d at 68.

15

**2. *Causation***

An expert report "adequately addresses causation when the expert explains how and why [a] breach of the standard caused the injury in question by explain[ing] the basis of his statements and link[ing] conclusions to specific facts." *Bush*, 714 S.W.3d at 544 (internal quotations omitted). "The court's role with respect to causation is to determine whether the expert has *explained* how the negligent conduct caused the injury, not whether the expert has *proved* causation." *Id.* (internal quotations omitted). A report is sufficient "if it makes a good faith effort to explain, factually, how proximate cause is *going to be* proven." *Id.* (emphasis added) (internal quotations omitted). "[W]hether there is actually a causal connection . . . is a matter to be determined at summary judgment and beyond." *Id.* (internal quotations omitted).

Proximate cause consists of cause-in-fact and foreseeability. *Id.* Cause-in-fact means that the defendant's "negligent act or omission was a substantial factor in bringing about the injury, without which the harm would not have occurred." *Id.* (internal quotations omitted). The act or omission need not be the sole cause of an injury, nor the immediate cause. *Windrum*, 581 S.W.3d at 777–78. But-for causation may be present at the aggregate level. *Pediatrics Cool Care v. Thompson*, 649 S.W.3d 152, 160 (Tex. 2022). And an expert may show causation by explaining a chain of events. *Owens v. Handyside*, 478 S.W.3d 172, 189 (Tex. App.—Houston

16

[1st Dist.] 2015, pet. denied).[9]   An "injury is foreseeable if its general character . . . might reasonably have been anticipated." *Bush*, 714 S.W.3d at 544 (internal quotations omitted).

Here, Dr. Korbaj opines that but for the breach of the standard of care by Cheon, "it is more likely than not and within a reasonable degree of medical probability that [Carolyn's] wounds would not have worsened, become infected, her Achilles would not have necrosed, she would not have developed sepsis, and would not have died."

As discussed above, Dr. Korbaj explains the deterioration in Carolyn's wounds from the day she was admitted to Crimson to the day she was transferred to the hospital.  And he concludes that, "[w]hile in the care of NP Cheon[,] . . . it is undisputable that [Carolyn's] pressure injuries worsened."  He opines that such deterioration was "due to the lack of wound care" and "lack of appropriate wound care consults, like vascular or podiatry."  And "[i]t is more likely than not that [Carolyn's] necrotic ulcer and necrotic Achilles were the cause of [her] sepsis, which is also supported by the diagnosis of cellulitis and the wound cultures that grew Acin[et]obacter and MRSA."

---

[9]   *See, e.g.*, *Methodist Health Ctrs. v. Mackender*, No. 01-24-00351-CV, 2025 WL 3454612, at *3 (Tex. App.—Houston [1st Dist.] Dec. 2, 2025, no pet.) (mem. op.).

Dr. Korbaj links his conclusions to the facts in Carolyn's medical record. Namely, when Carolyn arrived at the hospital, she "was already showing signs of sepsis such as an altered mental state and lethargy." And her "lactic acid was on the very high end of normal when she was admitted," which "supports sepsis"—"the inflammatory response syndrome in the presence of suspected or proven infection." The hospital immediately began antibiotics, and Carolyn was seen by a podiatrist the next day. Subsequently, fifty percent of the width of Carolyn's Achilles tendon was removed. But her advanced condition declined, and she died days later of "septic shock with multiorgan dysfunction syndrome." Dr. Korbaj discusses the risk of sepsis from necrotic wounds and the possibility of subsequent death. And he opines that Cheon's "delay in treatment was the cause of [Carolyn's] wounds further developing" and becoming infected, which "led to cellulitis, sepsis, and her death."

Thus, Dr. Korbaj's report explains that Cheon's failure to order a consultation with a podiatrist while Carolyn was at Crimson was a substantial factor in bringing about her injuries. *See Bush*, 714 S.W.3d at 544. He explains the factual basis of his opinions and links Cheon's alleged conduct with Carolyn's subsequent development of sepsis and her death from septic shock. *See id.* Whether his explanation is credible, reasonable, or believable is irrelevant; those questions are to be litigated later in the proceedings. *See id.* at 545.

18

As to foreseeability, Dr. Korbaj notes that infection is a well-known and common cause of sepsis, that sepsis can cause death, and that "any reasonable and prudent" nurse practitioner "caring for a patient with a necrotic and painful Achilles wound would have ordered" a consult with a podiatrist. Thus, he makes a good faith effort to explain that the "general character of Carolyn's injuries might reasonably have been anticipated." *See id.* at 544; *Methodist Health Ctrs. v. Mackender*, No. 01-24-00351-CV, 2025 WL 3454612, at *4 (Tex. App.—Houston [1st Dist.] Dec. 2, 2025, no pet.) (mem. op.).

In *Durham*, a nurse practitioner ordered—then cancelled—a cardiology consultation for a patient who had been diagnosed with an enlarged aorta after a car accident. 402 S.W.3d at 394. Instead, the nurse practitioner ordered only a chest x-ray. *Id.* The x-ray showed no abnormality in the patient's aorta. *Id.* And the patient was subsequently discharged—having never received the cardiac consultation or treatment. *Id.* The patient died two years later from a ruptured aorta. *Id.* The patient's family sued the nurse practitioner for negligence. *Id.*

The expert in *Durham* opined that the patient's aortic enlargement was a progressively worsening condition and that the rupture ultimately occurred due to a lack of intervention and available care. *Id.* at 402. He opined that the nurse practitioner's failure to order the cardiac consultation caused or contributed to "the ultimate outcome of the rupture of the aorta, and the otherwise preventable, untimely

19

death of [the patient]." *Id.* The court of appeals concluded that the expert report was sufficient as to causation with respect to the nurse practitioner. *Id.* at 403.

Similarly here, the trial court reasonably concluded that Dr. Korbaj's report constitutes a good-faith effort to provide a fair summary of the causal relationship between Cheon's alleged breach of the standard of care and Carolyn's death. *See* TEX. CIV. PRAC. & REM. CODE § 74.351(r)(6); *Durham*, 402 S.W.3d at 396; *Webb*, 228 S.W.3d at 282 (form of report and location of information in report are not dispositive).[10]

Cheon argues that Dr. Korbaj "never explained how and why . . . ordering the podiatry consult 10 days earlier, or any other earlier intervention, would have resulted in a different treatment or a different outcome from sepsis or death." "But the absence of an opinion stating with specificity at what point in the continuum of disease progression an intervention would have proven timely" does not render a causation opinion conclusory at this early stage of evaluation. *Puppala v. Perry*, 564 S.W.3d 190, 201 (Tex. App.—Houston [1st Dist.] 2018, no pet.).

---

[10]  *See, e.g.*, *Magnolia Place Health Care, L.L.C.*, 2021 WL 6138801, at *12 (expert report drew line directly from nurses' failure to treat pressure ulcers to patient's development of sepsis, muti-organ failure, and death); *Jones v. Ashford Hall, Inc.*, No. 05-16-01402-CV, 2018 WL 2315960, at *10 (Tex. App.—Dallas May 22, 2018, pet. denied) (mem. op.) (expert report adequately established causation by explaining that defendant's failure to treat pressure ulcers caused them to worsen, become infected, and caused "multiple illnesses and injuries that culminated in [patient's] death").

Cheon further argues that Dr. Korbaj failed to address Carolyn's "other co-morbidities" that might have caused her death. But, at this pre-discovery stage, Knowles's burden is not to *prove* a causal link. *See id.* at 202. And the report need not "rule out every possible cause of the injury, harm, or damages claimed." *Curnel v. Hous. Methodist Hosp.-Willowbrook*, 562 S.W.3d 553, 562 (Tex. App.—Houston [1st Dist.] 2018, no pet.) (internal quotations omitted). As the Texas Supreme Court has stated: "Importantly, we have never required an expert to anticipate or rebut all possible defensive theories that may ultimately be presented to the trial court as litigation proceeds." *Bush*, 714 S.W.3d at 545 (internal quotations omitted).

Based on all the foregoing, we conclude that Dr. Korbaj's report represents an objective, good-faith effort to inform Cheon of the applicable standard of care, her breach of that standard, and the causal relationship between her failure to provide care in accordance with the pertinent standard and Carolyn's death. *See* TEX. CIV. PRAC. & REM. CODE § 74.351(*l*), (r)(6); *Bush*, 714 S.W.3d at 543–44. Accordingly, we hold that the trial court did not err in denying Cheon's motion to dismiss Knowles's health-care-liability claim.[11]

---

[11] An expert report that satisfies the elements, "even if as to one theory only, entitles the claimant to proceed with a suit against the physician or health care provider." *Certified EMS, Inc. v. Potts*, 392 S.W.3d 625, 630 (Tex. 2013) ("No provision of the Act requires an expert report to address each alleged liability theory."). Having concluded that Knowles's expert report satisfies the elements as to at least one viable liability theory against Cheon, we do not reach whether the report also adequately addresses Knowles's other negligence theories against Cheon.

21

## Conclusion

We affirm the trial court's order.


Terry Adams
Chief Justice

Panel consists of Chief Justice Adams and Justices Guerra and Guiney.