AFFIRM; Opinion Filed November 6, 2012.



In The

# Court of Appeals
## Fifth District of Texas at Dallas

### No. 05-12-00033-CV

## LARRY A. WHITFIELD, M.D., TEXOMACARE, SAM GEORGE THOYAKULATHU, M.D., and JOHN NELSON LITTRELL, M.D., Appellants

### V.

## MARJOYRIE HENSON, INDIVIDUALLY AND AS NEXT FRIEND OF R.D., A MINOR, Appellee

**On Appeal from the 192nd Judicial District Court
Dallas County, Texas
Trial Court Cause No. DC-11-07563-K**

# OPINION

Before Justices O'Neill, FitzGerald, and Lang-Miers
Opinion By Justice Lang-Miers

This is an interlocutory appeal from the trial court's orders denying appellants' motions to dismiss appellee's health care liability lawsuit for failure to comply with the expert report requirements in chapter 74 of the Texas Civil Practice and Remedies Code. We affirm the trial court's orders.

## BACKGROUND

In June 2009 Marjoyrie Henson went to the emergency room at Red River Regional Hospital in Bonham, Texas, complaining about abdominal pain. She was treated for hypertension and

released. Over the next two months, Henson saw appellants and four other health care providers for uncontrolled hypertension, hyperthyroidism, anxiety, weight gain, abdominal pain, nausea, and vomiting. None of the providers tested Henson, who was 42 years old at the time, to see if she was pregnant; some of the medications they prescribed for her conditions were contraindicated for pregnancy. In November Henson went back to the emergency room complaining again of abdominal pain and also leakage of fluid and blood from her vagina. She learned then that she was almost 27 weeks pregnant and would have been pregnant in the summer when she saw appellants. She was transferred to another facility where she underwent an emergency caesarian section five days later. She gave birth to a son, R.D., at almost 27 weeks gestation. He was born with very low birth weight, required resuscitation, and was subsequently diagnosed with respiratory distress syndrome, perinatal depression, anemia, apnea of prematurity, tachypnea, subgaleal hemorrhage, gastroesophageal reflux, encelphalomalacia, intracranial hemorrhage, hydrocephalus, seizure disorder, blindness, developmental delays, and brain damage.

Henson sued appellants and the other health care providers she saw during the summer of 2009 alleging, among other things, that they were negligent by failing to test her for pregnancy, failing to diagnose her pregnancy, failing to refer her to an obstetrician/gynecologist for prenatal care, and prescribing medications contraindicated for pregnancy. She alleged that as a result of appellants' negligence, she was denied the opportunity for prenatal care and her son was born prematurely with numerous permanent, serious injuries. She alleged that R.D. will require lifetime medical and custodial care and most likely will never be gainfully employed.

Henson filed six expert reports pursuant to section 74.351 of the Texas Civil Practice and Remedies Code. Appellants objected to the expert reports and moved to dismiss Henson's claims. At a hearing on the motions, appellants challenged the expert reports on the issue of causation. The trial court denied the motions and this interlocutory appeal followed.

## STANDARD OF REVIEW

We review a trial court's ruling on a motion to dismiss a health care liability claim for an abuse of discretion. *Brewer v. Standefer*, 366 S.W.3d 326, 329 (Tex. App.—Dallas 2012, no pet.) (citing *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 875 (Tex. 2001)). A trial court abuses its discretion when it acts arbitrarily or unreasonably without reference to guiding rules or principles. *Id.* (citing *Jelinek v. Casas*, 328 S.W.3d 526, 539 (Tex. 2010)). When we review a matter committed to a trial court's discretion, we may not substitute our judgment for that of the trial court. *Id.* at 329–30.

## APPLICABLE LAW

The Texas Medical Liability Act requires a claimant asserting a health care liability claim to serve each party with one or more expert reports and the expert's curriculum vitae no later than 120 days after the original petition is filed. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(a) (West 2011). An expert report is

> a written report by an expert that provides a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed.

*Id.* § 74.351(r)(6). "The purpose of the expert report requirement is to deter frivolous claims, not to dispose of claims regardless of their merits." *Loaisiga v. Cerda*, No. 10-0928, 2012 WL 3800322, at *6 (Tex. Aug. 31, 2012) (quoting *Scoresby v. Santillan*, 346 S.W.3d 546, 554 (Tex. 2011)); *Samlowski v. Wooten*, 332 S.W.3d 404, 410 (Tex. 2011). "[T]he expert report must represent only a good-faith effort to provide a fair summary of the expert's opinions. A report need not marshal all the plaintiff's proof, but it must include the expert's opinion on each of the elements identified in the statute." *Loaisiga*, 2012 WL 3800322, at *6 (quoting *Palacios*, 46 S.W.3d at 878). A report qualifies as an objective good faith effort if it informs "the defendant of the specific conduct the

plaintiff questions" and provides "a basis for the trial court to conclude that the plaintiff's claims have merit." *Id.* at *9 (citing *Scoresby*, 346 S.W.3d at 556). "A report meets the minimum qualifications for an expert report under the statute 'if it contains the opinion of an individual with expertise that the claim has merit, and if the defendant's conduct is implicated.'" *Id.* (quoting *Scoresby*, 346 S.W.3d at 557). "An expert report . . . is a low threshold a person claiming against a health care provider must cross merely to show that [her] claim is not frivolous." *Id.* at *13 (Hecht, J., concurring in part and dissenting in part).

## DISCUSSION

In a joint brief on appeal, appellants contend that Henson's expert reports "simply conclude that the lack of prenatal care and use of potentially contraindicated medications caused [R.D.'s] injuries." They argue that the expert reports are conclusory because they do not explain how or why the lack of prenatal care or the use of potentially harmful medications caused R.D.'s injuries. And they argue that Texas law does not allow the trial court to make "assumptions to fill in the empty blanks . . . ." Appellants do not challenge the experts' qualifications or their opinions on the standard of care or how the standard of care was breached; they challenge only the experts' opinions on causation.

We begin our analysis with the allegations of negligence in Henson's pleading. She alleged that appellants were negligent by:

a.    failing to take a proper medical history from [her];

b.    failing to test [her] for pregnancy and diagnose [her] as pregnant;

c.    failing to inform [her] that she was pregnant;

d.    failing to refer [her] to an OB/GYN for prenatal care;

e.    failing to recommend to [her] that she receive treatment from an OB/GYN including prenatal care; and

-4-

f.  prescribing medication(s) to [her] contraindicated for pregnancy and/or medication(s) likely to injure [her] fetus, without first ruling out pregnancy in a woman of child bearing age with complaints of abdominal pain.

Henson served two expert reports on the issue of causation. We may resolve this interlocutory appeal by examining only one of those reports—that of Dr. Robert Atlas, a board certified obstetrician/gynecologist with a subspecialty in maternal–fetal medicine.

Dr. Atlas noted in his report that Henson was of child-bearing years with one prior term delivery and had chronic hypertension, a history of pituitary adenoma, and hyperthyroidism. He described in detail Henson's medical history from the time she first went to the emergency room in June until R.D. was born in early December. The following is a summary of his report about Henson's medical history:

Henson went to the emergency room on June 21, 2009, complaining of abdominal pain. Dr. Thomas Walker treated Henson and diagnosed her with hypertension. She was given Clonidine, Lisinopril, and started on Benazepril. Dr. Walker instructed Henson to follow up with a primary care physician. A few days later, Henson saw Dr. Sam George Thoyakulathu, an internal medicine physician, who diagnosed Henson with hypertension and hyperthyroidism. Dr. Thoyakulathu saw Henson three times; he discontinued the Benazepril and started her on Exforge, Inderal, and PTU. He also referred Henson to Dr. Larry A. Whitfield, an endocrinologist, and Dr. Martin Gregory Farrell, a gastroenterologist. Henson saw Dr. Whitfield in July 2009 and complained of general anxiety, weight gain, and nausea. Dr. Whitfield diagnosed Henson with a thyroid disorder, hypertension, and nausea, and prescribed Methimazole. Henson saw Dr. Farrell in August 2009. Dr. Farrell documented that Henson had a two-month history of persistent abdominal pain, nausea, and vomiting; she also had gained 37 pounds over 4 months. Dr. Farrell prescribed Zegerid. Later that month, Henson saw Dr. John Nelson Littrell, a general surgeon, about removing a polyp on her gallbladder, but the surgery was not performed. Dr. Littrell also documented Henson's history of

abdominal pain, nausea, and recent weight gain. On November 27, 2009, Henson again went to the emergency room at Red River Regional Hospital complaining of abdominal pain and also leakage of fluid and blood from her vagina. The doctor determined that Henson was almost 27 weeks pregnant. She was diagnosed with "preterm premature prolonged rupture of membranes, severe hypertension with superimposed preeclampsia, and GU Infection." She was transferred to Medical Center of Plano where R.D. was delivered by emergency caesarian section on December 2, 2009.

Dr. Atlas noted that none of the health care providers treating Henson in the summer of 2009 ordered a pregnancy test despite her "classic symptoms of pregnancy[.]" He concluded that the lack of prenatal care and the improper use of medications were the proximate causes of R.D.'s injuries. His report stated:

> The proximate cause of injuries as described above to [R.D.] is the fact that his mother did not receive any prenatal care. Prenatal care improves pregnancy outcomes. This time allows for the use of appropriate medications, use of medications safe in pregnancy, use of medicines such as folic acid which has been shown to improve pregnancy outcomes. Patients with high risk factors are seen much more frequently to adjust medications and optimize outcomes. This is especially true in regard to Ms. Henson's blood pressures and the inability to control them at all during the period of her care. She would have been seen every other week to watch her blood pressures. She would have been placed on medications safe in pregnancy such as methyldopa, labetalol, or nifedipine. Ms. Henson would have had every 4–6 week thyroid levels drawn and adjusted. The fetus would have been monitored closely throughout the pregnancy with at least monthly ultrasounds for growth and Doppler velocimetry (blood flow to the placenta, fetus and mother).

> Prenatal care allows for the appropriate dating of pregnancies and maximizes the ability of a successful pregnancy. No prenatal care is associated with an increased risk of poor pregnancy outcome. This includes a higher risk for preterm birth, low birth weight, and intrauterine growth restriction. Prematurity causes the highest risk of complications to the infant including long term morbidity and mortality. [R.D.]'s injuries were caused by a lack of prenatal care which his mother Marjoyrie Henson was not provided. If she had been referred to an OB/GYN early in pregnancy, [R.D.] would not have suffered a preterm delivery and all of the complications which he has and continues to suffer from. This is within a reasonable degree of medical probability.

> Ms. Henson had a prior history of a term birth. It is unusual for someone to have a term birth as she had and end up with such severe complications related to

–6–

pregnancy. The lack of identification of the pregnancy along with improper use of medications was a proximate cause of the complications associated with [R.D.].

Appellants contend that Dr. Atlas's report is conclusory because it does not explain why or how the lack of prenatal care or the medications caused R.D.'s injuries. They argue that Dr. Atlas's report leaves unanswered:

(1) How R.D.'s injuries of respiratory distress syndrome, perinatal depression, anemia, apnea of prematurity, tachypnea, subgaleal hemorrhage, gastroesophageal reflux, encephalomalacia, intracranial hemorrhage, hydrocephalus, seizure disorder, blindness, developmental delays, and brain damage were caused by a lack of prenatal care, or would have been prevented by prenatal care;

(2) How R.D.'s injuries of respiratory distress syndrome, perinatal depression, anemia, apnea of prematurity, tachypnea, subgaleal hemorrhage, gastroesophageal reflux, encephalomalacia, intracranial hemorrhage, hydrocephalus, seizure disorder, blindness, developmental delays, and brain damage were caused by the contraindicated medications, or would have been prevented by different medications or stopping the medications altogether;

(3) How prenatal care would have effectively avoided the eventual outcome of the pregnancy, given Henson's chronic hypertension;

(4) Which of R.D.'s injuries are attributable to a lack of prenatal care;

(5) At what point in the pregnancy R.D.'s injuries caused by a lack of prenatal care occurred;

(6) At what point in the pregnancy the injuries caused by a lack of prenatal care were irreversible;

(7) How pregnancy-safe blood pressure medications would have successfully controlled Henson's severe hypertension and thus avoided preterm labor, given the fact her hypertension was not responding to any of the several medications she was prescribed;

(8) How a lack of prenatal care, as opposed to Henson's chronic hypertension, caused R.D.'s premature birth, given the fact premature birth is a known risk of uncontrolled hypertension;

(9) Which of R.D.'s injuries are attributable to the medications Henson ingested while pregnant;

(10) Which of the medications Henson ingested while pregnant caused R.D.'s injuries;

(11) How the medications Henson took in pregnancy caused R.D.'s injuries;

(12) At what point in the pregnancy the injuries caused by the medications Henson ingested occurred; and

(13) At what point in the pregnancy the injuries caused by the medications Henson ingested were irreversible.

Appellants argue, "With nothing to connect the Appellants' acts or omissions to the 15 different injuries R.D. allegedly suffered, Henson is asking the Court to assume the answers to the 13 questions Dr. Atlas failed to address in the four corners of his report." But "[a] report need not marshal all the plaintiff's proof . . . ." *See Loaisiga*, 2012 WL 3800322, at *6. "A core purpose of the [Texas Medical Liability Act] was to identify and eliminate frivolous health care liability claims expeditiously, while preserving those of potential merit." *Samlowski*, 332 S.W.3d at 410 (citing legislative history).

Dr. Atlas's report stated that the lack of prenatal care causes a high risk of premature birth and that prematurity is the highest risk for complications in infants. He stated that Henson had given birth before and it was unusual for a woman with a history of a term birth to have "such severe complications related to pregnancy." He also stated that if Henson had received prenatal care, her hypertension would have been monitored closely, she would have been seen every other week, she would have been given medications that were safe for her, her thyroid levels would have been monitored every four to six weeks, and her medications would have been adjusted as necessary. He stated that the fetus also would have been monitored more closely "with at least monthly ultrasounds for growth and Doppler velocimetry (blood flow to the placenta, fetus and mother)." He stated that maternal–fetal specialists such as himself "routinely diagnose" and care for conditions such as Henson's. With regard to the improper use of medications, Dr. Atlas stated that Lisinopril "can cause significant harm to a fetus including fetal anomalies and renal failure"; that Benazepril "is not recommended for use in pregnancy due to the risk of fetal harm (birth defects) to an unborn baby";

—8—

and Inderal is "an older beta blocker [which] is not used in pregnancy secondary to the risk of fetal growth restriction." He noted that R.D. was born prematurely with low birth weight and suffered significant permanent and serious injuries which he attributed in part to the improper use of medications in the mother. Dr. Atlas concluded that if Henson had been referred to an obstetrician/gynecologist early in her pregnancy, R.D. would not have been born prematurely or suffered the complications of a premature birth.

In summary, the report explained why prenatal care was necessary for Henson, a high-risk patient; it explained the complications associated with a lack of prenatal care; it explained the treatment Henson and the fetus would have received with prenatal care; it explained that the lack of prenatal care causes premature birth and other complications to the fetus, which were present in this case; it explained that many of the medications Henson was prescribed were known to cause birth defects or other harm to the fetus, which were present in this case; and it concluded that the lack of prenatal care and improper use of medications were the proximate causes of R.D.'s injuries.

We conclude that the report contained Dr. Atlas's opinion that the claim has merit, implicated appellants' conduct, and constituted a fair summary of his expert opinion on causation. *See Loaisiga*, 2012 WL 3800322, at *6, 9. The report informed appellants of the specific conduct in question and gave the trial court a basis to conclude that Henson's claims have potential merit. *See id.* at *9; *Samlowski*, 332 S.W.3d at 410. Accordingly, we conclude that the trial court did not abuse its discretion by denying appellants' motions to dismiss. Because we conclude that Dr. Atlas's report satisfies chapter 74's requirements for an expert report on the issue of causation, we do not need to consider the reports of Henson's other experts.

## CONCLUSION

We affirm the trial court's orders.

ELIZABETH LANG-MIERS
JUSTICE

120033F.P05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

LARRY A. WHITFIELD, M.D.,
TEXOMACARE, SAM GEORGE
THOYAKULATHU, M.D., AND JOHN
NELSON LITTRELL, M.D., Appellants

No. 05-12-00033-CV      V.

MARJOYRIE HENSON, INDIVIDUALLY
AND AS NEXT FRIEND OF R.D., A
MINOR, Appellee

Appeal from the 192nd Judicial District
Court of Dallas County, Texas. (Tr.Ct.No.
DC-11-07563-K).
Opinion delivered by Justice Lang-Miers,
Justices O'Neill and FitzGerald
participating.

In accordance with this Court's opinion of this date, the orders of the trial court denying appellants' motions to dismiss are **AFFIRMED**. It is **ORDERED** that appellee Marjoyrie Henson, Individually and as Next Friend of R.D., a Minor recover her costs of this appeal from appellants Larry A. Whitfield, M.D., TexomaCare, Sam George Thoyakulathu, M.D., and John Nelson Littrell, M.D.

Judgment entered November 6, 2012.

ELIZABETH LANG-MIERS
JUSTICE