**REVERSE and REMAND; and Opinion Filed April 30, 2015.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-14-00895-CV

### TEXAS HEALTH HARRIS METHODIST HOSPITAL FORT WORTH, Appellant
### V.
### GREG FRAUSTO, INDIVIDUALLY AND AS HEIR TO THE ESTATE OF DIANE RIMERT, DECEASED, AND GLEN FRAUSTO, INDIVIDUALLY AND AS HEIR TO THE ESTATE OF DIANE RIMERT, DECEASED, AND JAMIE SNOW, INDIVIDUALLY AND AS HEIR TO THE ESTATE OF DIANE RIMERT, DECEASED, Appellees

**On Appeal from the 68th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DC-12-13131**

## MEMORANDUM OPINION

Before Justices Lang-Miers, Brown, and Schenck
Opinion by Justice Schenck

In this interlocutory appeal, appellant Texas Health Harris Methodist Hospital Fort Worth ("Hospital") appeals from an order denying its motion to dismiss health care liability claims brought against it by appellees. We reverse the trial court's order and remand the case for a determination whether to grant appellees a thirty-day extension to cure the deficiencies in their expert report. TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(c) (West Supp. 2014).

### BACKGROUND

Diane Rimert died in the Hospital on February 16, 2012. She was 67 years old. Rimert had signed a Do Not Resuscitate Order ("DNR") in 2009 as well as a Medical Power of Attorney ("MPOA") in 2010 designating Doris Jernigan as her agent for medical decisions. Appellees are

Rimert's sons and daughter, who brought suit individually and on behalf of Rimert's estate against the Hospital and others. Appellees allege the Hospital breached the standard of care by withholding lifesaving treatment after appellees raised concerns about Rimert's capacity to sign the DNR and MPOA due to her history of mental illness, and requested the Hospital to investigate the circumstances surrounding the execution of the documents before complying with their requirements.

On March 6, 2013, appellees served the expert report and curriculum vitae of Lige B. Rushing, Jr., M.D., in an effort to comply with the requirements of Chapter 74 of the Texas Civil Practice and Remedies Code. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(a). Dr. Rushing is a physician practicing in Dallas who is board certified in internal medicine, rheumatology, and geriatrics. Dr. Rushing opined that the Hospital's care and treatment of Rimert fell below the accepted standards of care in three respects. First, the Hospital and its staff "failed to validate the DNR/[M]POA documents upon which they were relying." Second, the Hospital "failed to properly address the question of Mrs. [Rimert's] DNR/MPOA status." Third, the Hospital "failed [to] provide appropriate life-support measures for Mrs. Rimert."

Dr. Rushing's report specifically addresses the Hospital's actions or failures to act with respect to Rimert's DNR and MPOA:

> Mrs. Rimert has twin sons, Greg and Glenn Frausto. Greg Frausto in an affidavit dated 7/30/12 and in a personal telephone conversation with me he describes his experience at the [Hospital]. He relates that he spoke with the patient advocate and members of the hospital administration explaining to them that his mother had a long history of mental illness and that the medical power of attorney and the do not resuscitate order in her record was invalid because his mother was not competent to execute such a document. He requested that his mother not be sent back to the Pennsylvania facility and that when she was dismissed that a different nursing home be found. He also requested that his mother be provided with advanced life support IE intubation and placement on a respirator. Both of these requests were ignored since Doris Jernigan was his mother's power of attorney and the hospital was choosing to follow her wishes and direction regarding his mother's care. As a result Mrs. Rimert was not intubated and did not receive advanced life support in the form of artificial ventilation.

–2–

The standard care for the [Hospital] and its staff requires that they be certain that all do not resuscitate documents and medical power of attorney documents are valid. In the event that there is a dispute regarding the validity of a DNR or medical power of attorney document the hospital must not execute a DNR or withhold life-support until the disputed issue is resolved in an appropriate manner. In this case, in order to meet the standard of care, what should have been done is that advanced life support IE ventilation support as requested by her son should have been provided until the dispute regarding the medical power of attorney could be resolved. There should've been a formal meeting of the family, Doris Jernigan, Mrs. Rimert's sons, Greg and Glenn Frausto, Mrs. Rimert's attending physician, hospital administration representative, hospital nursing service representative, patient advocate representative, and ethics committee representative and an effort made by this group to resolve the question of the validity of Mrs. Rimert's do not resuscitate document and medical power of attorney document. If no resolution could be reached by this group then the matter should have been taken up by the appropriate court/legal entity. Until a final solution was found [the Hospital] had the obligation, regardless of whether or not her son requested them do so, to provide life-support measures.

The original version of Dr. Rushing's report is dated March 1, 2013. On March 15, 2013, appellees proffered an "amended Page 9" to Dr. Rushing's report. The new page 9[1] adds a sentence after Dr. Rushing's statement that the Hospital's care and treatment of Rimert fell below the accepted standards of care. Dr. Rushing adds, "It is my opinion that the failures listed here more likely than not proximately caused Mrs. Rimert's untimely death." On March 27, 2103, the Hospital filed its objections to the sufficiency of Dr. Rushing's report and sought dismissal of appellees' claims. The Hospital neither objected to the insertion of the new page nor addressed Dr. Rushing's added statement regarding proximate cause, but clearly objected to a lack of causation in Dr. Rushing's original report, stating that the report "does not address the causal relationship between [the Hospital's] alleged failure to meet the standard of care and how it proximately caused Rimert's death." The trial court overruled the Hospital's objections and denied its motion to dismiss in an order dated June 19, 2014. This appeal followed.

---

[1] The copy of the amended page in the record is numbered 9, and the cover letter attaching it refers to it as page 9. The amended page is actually the tenth page of the report; in the appellate briefing, the page is referenced as page 10.

STANDARD OF REVIEW

The Hospital asserts two issues on appeal. First, the Hospital contends the trial court erred by denying its motion to dismiss appellees' claims with prejudice for failing to tender an adequate expert report. Second, the Hospital asserts the trial court erred by failing to award its attorney's fees as a sanction for appellees' failure to tender an expert report. We review a trial court's decision on a motion to dismiss a health care liability claim under the expert report provisions of Chapter 74 for an abuse of discretion. *Whitfield v. Henson*, 385 S.W.3d 708, 710 (Tex. App.—Dallas 2012, no pet.). A trial court abuses its discretion if it acts arbitrarily, unreasonably, or without reference to any guiding rules or principles. *Id*. When we review a matter committed to a trial court's discretion, we may not substitute our judgment for that of the trial court. *Id.*

## DISCUSSION

### A. Chapter 74 Expert Reports

Chapter 74 of the Texas Civil Practice and Remedies Code requires a claimant pursuing a health care liability claim to serve one or more expert reports on each party no later than 120 days after the original petition is filed. TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(a). A report is sufficient to meet the requirements of Chapter 74 if it represents a good faith effort to comply with the definition of an expert report. *See id.* § 74.351(*l*). An expert report must provide a fair summary of the expert's opinions regarding applicable standards of care; the manner in which the care rendered by the health care provider failed to meet the standards; and the causal relationship between the failure and the injury, harm, or damages claimed. *Id.* § 74.351(r)(6) (defining "expert report"). If a report is timely served, a defendant whose conduct is implicated must serve any objection to the sufficiency of the report not later than the 21st day after the date it was served, "failing which all objections are waived." *Id.* § 74.351(a).

"The purpose of the expert report is to deter frivolous claims, not to dispose of claims regardless of their merits." *Whitfield*, 385 S.W.3d at 711 (quoting *Loaisiga v. Cerda*, 379 S.W.3d 248, 258 (Tex. 2012)). "[T]he expert report must represent only a good-faith effort to provide a fair summary of the expert's opinions. A report need not marshal all the plaintiff's proof, but it must include the expert's opinion on each of the elements identified in the statute." *Loaisiga,* 379 S.W.3d at 258 (quoting *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios,* 46 S.W.3d 873, 878 (Tex. 2001)). A report qualifies as an objective good faith effort if it informs "the defendant of the specific conduct the plaintiff questions" and provides "a basis for the trial court to conclude that the plaintiff's claims have merit." *Id.* at 260 (citing *Scoresby v. Santillan,* 346 S.W.3d 546, 556 (Tex. 2011)); *Bakhtari v. Estate of Dumas*, 317 S.W.3d 486, 496 (Tex. App.—Dallas 2010, no pet.). "A report meets the minimum qualifications for an expert report under the statute 'if it contains the opinion of an individual with expertise that the claim has merit, and if the defendant's conduct is implicated.'" *Loaisiga*, 379 S.W.3d at 260 (quoting *Scoresby,* 346 S.W.3d at 557). "An expert report . . . is a low threshold a person claiming against a health care provider must cross merely to show that [her] claim is not frivolous." *Id.* at 264 (Hecht, J., concurring in part and dissenting in part).

Chapter 74 also authorizes the trial court to give a plaintiff who meets the 120-day deadline an additional thirty days in which to cure a "deficiency" in the elements of the report. *Scoresby*, 346 S.W.3d at 549. When a deficiency may be cured in thirty days, the claim is not frivolous. *Id.* at 554. "[T]rial courts should be lenient in granting thirty-day extensions and must do so if deficiencies in an expert report can be cured within the thirty day period." *Id.*; *see also Biggs v. Baylor Univ. Med. Ctr.*, 336 S.W.3d 854, 857–60 (Tex. App.—Dallas 2011, pet. denied) (remanding cause for trial court's consideration of request for thirty-day extension to cure; noting recent case law requiring that "trial courts should err on the side of granting extensions").

## B. Sufficiency of report

### a. Standard of care and breach

The Hospital attacks the sufficiency of Dr. Rushing's report on several grounds. First, the Hospital contends that the report fails to articulate an applicable standard of care. The Hospital argues that Dr. Rushing offered a legal opinion, not a medical opinion, regarding the validity of "facially valid MPOA and DNR orders." The Hospital contends that Dr. Rushing's opinions are contrary to the statute governing the legal validity of Rimert's DNR and MPOA, the Advanced Directives Act set forth in Chapter 166 of the Texas Health and Safety Code. *See* TEX. HEALTH & SAFETY CODE ANN. §§ 166.001–166.166 (West 2010 & Supp. 2014). The Hospital argues, "[f]undamentally, Dr. Rushing's report is legally insufficient because he attempts to create an alleged 'standard of care' from what is essentially a legal issue regarding the validity of an advanced directive under Texas law." The Hospital discusses the provisions of the Advanced Directives Act and argues that Dr. Rushing's opinion contradicts them by requiring a hospital "to investigate or confirm the validity of an advance directive." The Hospital also argues that Dr. Rushing's opinions impose additional procedures not required by the Advanced Directives Act. The Hospital further contends that Dr. Rushing's report fails to give specific information about what the Hospital should have done differently; does not define "what constitutes a 'dispute' sufficient to disregard the patient's wishes as expressed in the MPOA/DNR"; and fails to specify how such a dispute might be resolved.

Dr. Rushing's report, however, does state a standard of care: "[t]he standard [of] care for the [Hospital] and its staff requires that they be certain that all do not resuscitate documents and medical power of attorney documents are valid." Dr. Rushing then explains the steps the Hospital should have taken in order to meet the standard of care. The Hospital disagrees with the standard and argues that it is contrary to Texas law. Appellees counter with their own arguments

–6–

regarding the Advanced Directives Act. Appellees also argue that medical ethics standards may require actions over and above mere compliance with statute. The parties' dispute regarding whether Dr. Rushing's standard of care is correct as a matter of law, however, is an issue for summary judgment. The procedures outlined in Chapter 74 are to provide a basis for the trial court to determine that a plaintiff's claims are not frivolous, not to decide the merits of the case. *See, e.g., Whitfield*, 385 S.W.3d at 711 (purpose of expert report is to deter frivolous claims, not to dispose of claims regardless of merits). To satisfy the requirements of Chapter 74, an expert report need not meet the same requirements as evidence offered in summary judgment proceedings or in a trial. *Bakhtari*, 317 S.W.3d at 496.

The Hospital also complains that Dr. Rushing did not identify any specific conduct in his report or explain how any conduct breached the standard of care. Dr. Rushing's report states, however, "[i]n this case, in order to meet the standard of care, what should have been done is that advanced life support IE ventilation support as requested by her son should have been provided until the dispute regarding the medical power of attorney could be resolved." Dr. Rushing goes on to explain that there should have been a meeting to discuss the dispute. He specifies the Hospital personnel who should have attended the meeting. He also specifies the measures that should have been taken during the pendency of the dispute, stating, "[u]ntil a final solution was found [the Hospital] had the obligation, regardless of whether or not her son requested them [to] do so, to provide life-support measures." We conclude Dr. Rushing's report provides a fair summary of his opinions regarding applicable standards of care, though they may not comport with the legal standards that would obtain and control at summary judgment. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(6); *Loaisiga,* 379 S.W.3d at 260.

### b. Qualifications to render opinion

The Hospital also contends that Dr. Rushing is not qualified to render his opinions regarding the Hospital. It argues that Dr. Rushing failed to explain any experience that would qualify him to opine "regarding a hospital's institutional policies and procedures related to validation of DNRs and MPOAs and the hospital's resolution of any disputes regarding DNRs and MPOAs." Dr. Rushing's service on a medical ethics committee does not, the Hospital argues, "qualify a physician to address what is essentially an institutional and legal process." The Hospital also cites *Nacogodches County Hospital District v. Felmet*, No. 12-12-00393-CV, 2013 WL 6207838, at *4 (Tex. App.—Tyler Nov. 26, 2013, no pet.) (mem. op.), in which the court concluded that "Dr. Rushing has failed to demonstrate that he is qualified to render an expert opinion on the Hospital's alleged failure to follow the standard of care for making an operating room available in a timely manner."

Dr. Rushing is board certified in internal medicine, rheumatology, and geriatrics, and is actively engaged in practice in these areas. He received his specialty training at the Mayo Clinic in Rochester, Minnesota, and is on the attending staff of Presbyterian Hospital in Dallas. In his report, Dr. Rushing described his knowledge of the accepted medical standards for treating patients such as Rimert, and explained that he has served as primary care physician for more than 10,000 hospitalized and nursing home patients in his career. He has examined, diagnosed, and treated patients "with complaints and diseases similar to or identical" to Rimert's, including high blood pressure, diabetes, pneumonia, pressure ulcers, and mental health problems such as bipolar disorder. In addition to his service on Presbyterian Hospital's medical ethics committee, he served as that hospital's "President of the medical/dental staff" and chairman of its bylaws committee.

–8–

In contrast to *Felmet*, Dr. Rushing's opinions in this case are matters of medical ethics and treatment of patients with medical conditions similar to Rimert's, in addition to "institutional policies and procedures." *See id.* In addition, as we have discussed, we have rejected the Hospital's contention that Dr. Rushing is offering a legal opinion rather than a medical opinion. Dr. Rushing's service on a hospital's medical ethics committee is directly relevant to the opinions he renders in this case. His report and curriculum vitae establish that Dr. Rushing is practicing health care in the field of practice and type of care at issue, specifically, care rendered to nursing home and hospital patients with the same "complaints and diseases" as Rimert. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.402(a)(1) (person may qualify as expert in health care liability claim only if he is practicing health care in field of practice involving same type of care or treatment as delivered by defendant health care provider). Dr. Rushing also has knowledge of the accepted standards of care for the medical conditions at issue, and is qualified by his training and experience to offer an opinion regarding the accepted standards of health care. *Id.* § 74.402(a)(2), (3).

The Hospital also contends that Dr. Rushing failed to differentiate between the conduct of Rimert's attending physicians and the Hospital's non-physician staff, and failed to demonstrate his qualifications to opine as to the latter. In the two cases the Hospital cites in support of its argument, however, the issue was whether the expert's report had addressed the conduct of each defendant. *See Taylor v. Christus Spohn Health Sys. Corp.*, 169 S.W.3d 241, 244 (Tex. App.— Corpus Christi 2005, no pet.) (expert report may not assert that multiple defendants are all negligent for failing to meet standard of care without explaining how each defendant specifically breached standard and how breach contributed to injury); *Ledesma v. Shashoua*, No. 03-05- 00454-CV, 2007 WL 2214650 (Tex. App.—Austin Aug. 3, 2007, pet. denied) (mem. op.) (expert reports did not specifically address conduct of certified nurse anesthetist who was defendant and

–9–

appellee).  In both of these cases, the report failed to "inform the defendant of the specific conduct the plaintiff has called into question."  *See Ledesma*, 2007 WL 2214650, at \*2 (citing *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 49, 52 (Tex. 2002) (per curiam)); *Taylor*, 169 S.W.3d at 243–44 (citing *Palacios*, 46 S.W.3d at 879).  Here, the defendant in question is the Hospital, and Dr. Rushing has discussed the specific conduct of the Hospital that he opines fell below the applicable standard of care.  We conclude that Dr. Rushing is qualified to render the opinions in his report regarding the Hospital.

### c. Causation

The Hospital further contends that Dr. Rushing's report "does not address the causal relationship between the Hospital's alleged failure to meet the standard of care and how it proximately caused Mrs. Rimert's death."  The Hospital argues, "[i]t was incumbent upon Dr. Rushing to articulate what measures the Hospital should have implemented and provide a medical explanation as to why, had those measures been implemented, Mrs. Rimert would have had a different medical outcome."  Dr. Rushing's report is clear that "what should have been done is that advanced life support," specifically, "ventilation support," "should have been provided until the dispute regarding the medical power of attorney could be resolved."  He repeats that the Hospital's treatment of Rimert fell below the accepted standard of care by failing to "provide appropriate life-support measures" to her.  It is undisputed that advanced life support was not provided.  Dr. Rushing does not offer an opinion on the cause of Rimert's death, however.  And although his report reflects that he reviewed Rimert's death certificate, he does not report its contents.  Rimert suffered from multiple medical conditions and was so seriously ill when admitted to the Hospital that she could not communicate with the providers of her care.[2]

---

[2] Dr. Rushing's report states that Rimert was "obtunded" upon her arrival at the Hospital.  The Hospital explains this term as "indicating [Rimert] was lethargic and nonresponsive, but not completely unconscious."

Dr. Rushing does not, absent the amended page,[3] opine that the Hospital's negligence caused Rimert's death. He does not explain how the advanced life support he recommended would have extended Rimert's life, nor does he offer explanation why her death was "untimely."

Dr. Rushing's report is in large part directed to Rimert's treatment in a rehabilitation facility by another defendant not a party to this appeal. His report details Rimert's development of pressure ulcers as well as "healthcare acquired pneumonia and extensive left lung infiltrate," for which she was admitted and treated at the Hospital. He recounts that the Hospital's physician, Dr. Gagadam, assessed Rimert "as having acute hypoxia respiratory failure," "extensive left lung infiltrate, pneumonia, urinary tract infection, hypertension, diabetes mellitus, bipolar disorder, and uterine cancer" on her admission to the Hospital the week before her death. His report explains that in his opinion, absent the failures of the other defendants to meet applicable standards of care, "Mrs. Rimert would not have died when she did." The report details Dr. Rushing's extensive review of Rimert's medical records, diagnoses, and history, as well as his experience in diagnosing and treating thousands of patients with similar or identical conditions and diseases. He opines that the Hospital's treatment of Rimert fell below accepted standards of care in three specific ways, and identified specific steps the Hospital failed to take. Dr. Rushing's report informs the Hospital "of the specific conduct the plaintiff questions" and provides "a basis for the trial court to conclude that the plaintiff's claims have merit." *See*

---

[3] As set forth above, appellees served an "amended" page to Dr. Rushing's report, in which Dr. Rushing adds, "It is my opinion that the failures listed here more likely than not proximately caused Mrs. Rimert's untimely death." The Hospital did not object to the amended page, even though appellees served it prior to the date the Hospital had filed or was required to file any objections to Dr. Rushing's report, and before the trial court considered the Hospital's motion to dismiss under Chapter 74. The Texas Supreme Court has explained that a trial court may consider a voluntary supplement to an expert's report timely responding to a defendant's specific objections before the trial court has an opportunity to rule on a defendant's motion to dismiss. *Leland v. Brandal*, 257 S.W.3d 204, 208 (Tex. 2008). The *Leland* court also explained that a plaintiff does not forfeit the possibility of obtaining a thirty-day extension to cure by voluntary supplementing an expert's report. *Id.* The sequence of events here is not precisely the same as in *Leland*. The amendment here was made prior to any objections by the Hospital, and was made shortly after the 120-day deadline for filing expert reports under Chapter 74 had elapsed. In any event, whether or not Dr. Rushing's report includes the sentence using the term "proximate cause," he has explained that because the Hospital "ignored" Rimert's son's concerns regarding her capacity to sign the DNR, Rimert "was not intubated and did not receive advanced life support in the form of artificial ventilation." As we discuss, the substance of Dr. Rushing's report includes the opinion that because Rimert did not receive life support, she died before concerns about the validity of her DNR could be addressed. But Dr. Rushing does not explain how or why this is so. As we remand for the trial court to consider appellees' request to cure, the trial court may likewise address whether it will consider the "amended" page.

–11–

*Loaisiga*, 379 S.W.3d at 260; *Bakhtari*, 317 S.W.3d at 496  But the report does not explain the causal link between the Hospital's specific conduct and Rimert's "untimely" death.  Given the report's extensive discussion of Rimert's medical history and treatment, however, it is possible that this deficiency may be cured.  Appellees sought the opportunity to cure in the alternative to denial of the Hospital's motion to dismiss.  The decision whether or not to allow the thirty-day extension to cure deficiencies lies with the trial court.  *See Biggs*, 336 S.W.3d at 856–57.  We sustain the Hospital's first issue in part, and remand the cause for the trial court's consideration whether to allow the extension of time.  *See id.* at 860.

### C.  Award of attorney's fees

The Hospital sought its attorney's fees as a sanction under section 74.351(b), and argues in its second issue that the trial court erred by failing to award them.  Subsection (b), however, is "subject to Subsection (c)," the thirty-day extension to cure deficiencies in the report.  Because we remand the case to the trial court for consideration whether to grant the thirty-day period to cure a deficiency in Dr. Rushing's report, we do not address this issue.

### CONCLUSION

The trial court abused its discretion by denying the Hospital's motion to dismiss because Dr. Rushing's expert report does not adequately articulate the causal relationship between the Hospital's failure to provide life support measures until the question of the validity of the DNR and MPOA was resolved, and Rimert's death.  Accordingly, we reverse the trial court's order denying the motion to dismiss and remand the cause to the trial court to consider whether to grant appellees a thirty-day extension to cure the deficiencies in Dr. Rushing's report.

/David J. Schenck/
_____
DAVID J. SCHENCK
JUSTICE

140895F.P05

–12–



## Court of Appeals
## Fifth District of Texas at Dallas

## JUDGMENT

TEXAS HEALTH HARRIS METHODIST
HOSPITAL FORT WORTH, Appellant

No. 05-14-00895-CV      V.

GREG FRAUSTO, INDIVIDUALLY AND
AS HEIR TO THE ESTATE OF DIANE
RIMERT, DECEASED, AND GLEN
FRAUSTO, INDIVIDUALLY AND AS
HEIR TO THE ESTATE OF DIANE
RIMERT, DECEASED, AND JAMIE
SNOW, INDIVIDUALLY AS HEIR
TO THE ESTATE OF DIANE RIMERT,
DECEASED, Appellees

On Appeal from the 68th Judicial District
Court, Dallas County, Texas
Trial Court Cause No. DC-12-13131.
Opinion delivered by Justice Schenck,
Justices Lang-Miers and Brown
participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **REVERSED** and this cause is **REMANDED** to the trial court for further proceedings consistent with the opinion.

It is **ORDERED** that appellant Texas Health Harris Methodist Hospital Fort Worth recover its costs of this appeal from appellees Greg Frausto, individually and as heir to the Estate of Diane Rimert, Deceased, and Glen Frausto, individually and as heir to the Estate of Diane Rimert, Deceased, and Jamie Snow, individually and as heir to the Estate of Diane Rimert, Deceased.

Judgment entered this 30th day of April, 2015.