**AFFIRM; and Opinion Filed April 16, 2019.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-17-01464-CV

### JMA PARTNERS, INC. D/B/A GUARDIAN PHARMACY SERVICES AND JACK R. MUNN, Appellants
### V.
### JESUS GUZMAN, Appellee

**On Appeal from the 95th District Court**
**Dallas County, Texas**
**Trial Court Cause No. DC-17-06313**

## MEMORANDUM OPINION

Before Justices Brown, Schenck, and Pedersen, III
Opinion by Justice Brown

In this interlocutory appeal, we consider whether expert reports filed by appellee Jesus

Guzman to support his health care liability claims against appellants JMA Partners, Inc. d/b/a

Guardian Pharmacy Services and its president Jack R. Munn (together, Guardian) meet the

requirements of chapter 74 of the civil practice and remedies code, the Texas Medical Liability

Act (TMLA). *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351. We conclude they do and affirm

the trial court's order overruling Guardian's objections to the reports and denying Guardian's

motion to dismiss.

BACKGROUND

In February 2017, Guzman underwent a routine cataract surgery during which the surgeon,

Jeffrey Whitman, M.D. of the Key-Whitman Eye Center (Key-Whitman), injected a

triamcinolone/moxifloxacin with Pluronic antibiotic and steroid medication (Tri-Moxi) into Guzman's eye. Guzman alleges the Tri-Moxi, which was compounded by Guardian, caused permanent damage to his eye. Guzman sued Guardian, alleging strict liability in tort, negligence, and gross negligence, and served expert reports by John Scott Karolchyk, MS, RPh, FIACP, and Wesley K. Herman, M.D.

Guardian moved to dismiss Guzman's claims, arguing the expert reports did not satisfy the TMLA requirement for a fair summary of the experts' opinions regarding the applicable standards of care, the failure to meet those standards, and the causal relationship between the failure and Guzman's injury. *See* CIV. PRAC & REM. § 74.3351(r)(6). Following a hearing, the trial court denied Guardian's motion, and Guardian filed this interlocutory appeal. In two issues, Guardian contends the trial court abused its discretion in overruling its objections to the expert reports and denying its motion to dismiss or, alternatively, should have provided a thirty-day extension for Guzman to attempt to cure the deficiencies in the reports.

APPLICABLE LAW

A plaintiff who files a health care liability claim must serve an expert report on each defendant early in the proceedings. CIV. PRAC. & REM. § 74.351(a).[1] An expert report is sufficient if it "provides a fair summary of the expert's opinions . . . regarding applicable standards of care, the manner in which the care rendered . . . failed to meet the standards, and the causal relationship between the failure and the injury, harm, or damages claimed." *Id*. § 74.351(r)(6). A trial court should grant a motion challenging the adequacy of a report "only if it appears to the court, after hearing, that the report does not represent an objective good faith effort to comply with the definition of an expert report in Subsection (r)(6)." *Id*. § 74.351(l).

---

[1] "In a health care liability claim, a claimant shall, not later than the 120th day after the date each defendant's original answer is filed, serve on that party or the party's attorney one or more expert reports, with a curriculum vitae of each expert listed in the report for each physician or health care provider against whom a liability claim is asserted." CIV. PRAC. & REM. § 74.351(a).

The report need not marshal all of a plaintiff's proof, but must include the expert's opinions on the standard of care, breach, and causation. *Baty v. Futrell*, 543 S.W.3d 689, 693–94 (Tex. 2018) (citing *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 877–79 (Tex. 2001)). The report must (1) inform the defendant of the specific conduct the plaintiff has called into question, and (2) provide a basis for the trial court to conclude the claims have merit. *Palacios,* 46 S.W.3d at 880 (although a fair summary "is something less than a full statement of the applicable standard of care and how it was breached," it must "set out what care was expected, but not given"). A report "must make a good-faith effort to explain, factually, how proximate cause is going to be proven," although the report need not use the words "proximate cause," "foreseeability," or "cause in fact." *Columbia Valley Healthcare Sys., L.P. v. Zamarripa*, 526 S.W.3d 453, 460 (Tex. 2017). "A conclusory statement of causation is inadequate; instead, the expert must explain the basis of his statements and link conclusions to specific facts." *Id.*

The trial court must consider an expert report in its entirety, rather than isolating specific portions or sections, to determine whether it includes the required information. *See Van Ness v. ETMC First Physicians*, 461 S.W.3d 140, 144 (Tex. 2015) (per curiam); *see also Austin Heart, P.A. v. Webb*, 228 S.W.3d 276, 282 (Tex. App.—Austin 2007, no pet.) ("The form of the report and the location of the information in the report are not dispositive."). Additionally, one expert need not address the standard of care, breach, and causation; multiple expert reports may be read together to determine whether the requirements have been met. *See* Civ. Prac. & Rem. § 74.351(i).

We review a trial court's ruling on a motion to dismiss under section 74.351 for an abuse of discretion. *Baty*, 543 S.W.3d at 693 n.4; *Children's Med. Ctr. of Dall. v. Durham*, 402 S.W.3d 391, 395 (Tex. App.—Dallas 2013, no pet.). A trial court abuses its discretion when it acts arbitrarily and without reference to guiding rules or principles. *Nexion Health at Duncanville, Inc. v. Ross*, 374 S.W.3d 619, 622 (Tex. App.—Dallas 2012, pet. denied). In analyzing a report's

sufficiency, we consider only the information contained within the four corners of the report. *See Palacios*, 46 S.W.3d at 878.

ANALYSIS

Guzman served Guardian with two expert reports. One report was prepared by John Scott Karolchyk, MS, RPh, FIACP, a formulation developer and compounding pharmacist who developed the "true" Tri-Moxi injectable formulation with Jeffrey Liegner, M.D., and patented it with Imprimis Pharmaceuticals in 2013. Liegner contacted Karolchyk on Dr. Whitman's behalf about potential retinal toxicity associated with a version of the formulation compounded by Guardian, and Karolchyk agreed to consult for Key-Whitman. Karolchyk evaluated and tested Guardian's version of the formulation, and his report contains the opinions he formed during his consultation.

Wesley K. Herman, M.D., an ophthalmic microsurgeon certified as a laser vision correction specialist in corneal and cataract surgery, prepared Guzman's second expert report. Herman has used injectable formulations, including compounded Tri-Moxi, as part of his daily practice and regularly examines patients with environmentally toxic and chemical issues, including patients on prescribed medications potentially toxic to ocular tissues and patients who have experienced retinal toxic events.

*1. Standard of Care and Breach*

Guardian complains Karolchyk's report, prepared as a Key-Whitman consultant, does not offer an opinion on the standard of care applicable to a compounding pharmacy or even indicate Karolchyk was asked to opine on the standard of care. Guardian maintains Karolchyk's report does not satisfy section 74.351's requirements because it simply compares the Guardian formulation to the patented formulation without identifying the patented formulation as the only acceptable formulation and fails to address any specific action or inaction by Guardian in

–4–

compounding the formulation, i.e., how to properly formulate the compound, sonicate it, test it, and what caused the pH to be too high. According to Guardian, Herman's report also does not adequately establish a standard of care and, as a physician, Herman is not qualified to offer an opinion on the standard or care for, or breach by, a compounding pharmacy or pharmacist.

Karolchyk, as a developer of the "true" patented Tri-Moxi injectable formulation, has been involved in testing the formulation and is familiar with its components and pharmaceutical parameters. To evaluate Guardian's Tri-Moxi formulation, Karolchyk reviewed documents, including the Guardian formulations, emails from Guardian and Key-Whitman, and formulation test results by DynaLabs. He also tested six vials from two different lots of the Guardian formulation. Karolchyk consulted with Imprimis Pharmaceuticals, confirming the true, original patented formulation and its manufacturing process.

According to Karolchyk's report, the Tri-Moxi formulation is "a sophisticated delivery system involving complex, multistep preparation, with significant potential for error" and only highly specialized, highly trained and knowledgeable professionals should prepare the injection following very strict procedures.[2] Karolchyk concluded with a reasonable degree of pharmaceutical certainty that Guardian's formulations were incorrectly formulated and not similar in any way to the tested, patented formulation. He further concluded the formulation was compounded improperly and in an unsafe manner, untested, and prepared outside the standard of care.

In support of his opinion, Karolchyk described the specific deficiencies in Guardian's formulation and processes:

---

[2] Karolchyk's report notes the FDA compliance policy guide and Good Compounding Practices do not allow compounding commercially available, patented drugs.

- The Guardian Tri-Moxi formulation's concentration pH, which was 7.5 to 8.0 as compared to the patented formulation pH of 6.0 to 6.5, was too high for ocular safety. Testing data indicated pH testing had not been completed.[3] Karolchyk tested the two lots of Guardian formulation he received and the pH of those lots, at 6.6 and 7.2, was out of specification.

- The Guardian formulation used poloxamer concentrations of twelve percent and six percent (unlike the less than three percent poloxamer concentration of the patented formulation). Further, Guardian's use of sonication and double sonication resulted in changes of viscosity, which can result in known degradation of components. Research studies have shown "sonication of poloxamer above concentrations of 5% . . . to degrade into toxic products." Poloxamer concentrations about five percent also "form bioadhesive gels when exposed to body temperature, resulting in gel expansion and a depot effect off the gel whenever it adheres in the ocular space after injection."

- Guardian did not test or analyze particle size distributions prior to dispensing to Key-Whitman. The patented Tri-Moxi formulation has ninety-eight percent of its triamcinolone acetonide particles less than five microns, confirming an "involved and tested pharmaceutical process which allows for reliable and reproducible injection and dispersion of the actives during injection."

- Guardian's in-house testing, when performed, used a "QT Micro" method in which the test solution is filtered into sample media. Suspension formulations, however, cannot be filtered. Guardian used a different test media, "TuffTest," for subsequent formulations, but did not provide validation of any media fills. Guardian also did not report any quarantine, which adds to patient safety before outside lab testing is completed.

The report does not include a section explicitly setting out a standard of care, but, considered in its entirety, Karolchyk makes clear that, in his expert opinion, the standard of care related to formulating, preparing, and testing a Tri-Moxi formulation is that used for the patented formulation. And, the report identifies Guardian's specific deficiencies in meeting that standard of care, including a formulation pH too high and dangerous to the human eye, a formulation improperly compounded based on testing showing the pH was out of specification, poloxamer concentrations well above the three percent used in the patented formulation, and improper testing

---

[3] Karolchyk's report also states that three items were out of specification in Guardian's quality control testing performed by DynaLabs, but it is unclear what those items are from the report.

–6–

for validation. The report adequately identifies the standard of care by setting forth "specific information about what the defendant should have done differently." *See Abshire v. Christus Health SE Tex.*, 563 S.W.3d 219, 226 (Tex. 2018) (quoting *Palacios*, 46 S.W.3d at 880); *Zamarripa*, 526 S.W.3d at 450 (an expert report's "adequacy does not depend on whether the expert uses any particular 'magical words'"); *see, e.g., Baty*, 543 S.W.3d at 695 (expert's opinion that anesthetist breached standard of care by sticking optic nerve with retrobulbar needle sufficiently, although not explicitly, identified standard of care as not sticking optic nerve with retrobulbar needle).

We disagree that more detail was required. An expert need not conclusively establish a standard of care; indeed, the parties to a medical malpractice claim often disagree over what the standard of care requires. *See Baty*, 543 S.W.3d at 695–96; *Certified EMS, Inc. v. Potts*, 392 S.W.3d 625, 630–31 (Tex. 2013). Because Karolchyk's report advises Guardian of the specific conduct in formulating, preparing, and testing its Tri-Moxi injectable formulation that Guzman, through Karolchyk, has called into question and provides the trial court a sufficient basis to reasonably conclude that Guzman's claims against Guardian have merit, the report satisfies section 74.351(r)(6)'s standard of care and breach requirements.[4] *See Baty*, 543 S.W.3d at 697.

*2. Causation*

Guardian contends the expert reports fail to adequately establish causation and, specifically, Herman's opinions on causation are conclusory and not linked to the alleged breach of the standard of care. Specifically, Guardian complains Herman neither explained what caused the pH level to become "too high" nor was able to state what the pH was in the medication that was injected into Guzman's eye.

---

[4] Accordingly, we need not address Guardian's arguments regarding whether Herman is qualified to opine on standard of care or breach in this case and the related opinions in his report.

–7–

According to his report, Herman's opinions are based upon his education, training, experience, pertinent medical literature, review of relevant medical records, Karolchyk's expert report and testing, and Herman's personal examination of Guzman. Herman's report sets out the following facts:

- Whitman performed cataract surgery on Guzman's left eye on February 16, 2017.

- At the conclusion of the procedure, Whitman injected a Tri-Moxi formulation into the vitreous of Guzman's eye to provide post-operative prophylaxis for ocular inflammation and endophthalmitis. Guardian compounded the formulation, which was an attempted copy of the patented formulation.

- Whitman noted that Guzman tolerated the procedure well.

- One week after surgery, Guzman's vision in his left eye was 20/30-2 without corrective lenses and his best corrected visual acuity was 20/25.

- On March 10, 2017, Guzman was diagnosed with +1 posterior capsule opacity and cystoid macular edema. His best corrected visual acuity was 20/200.

- Guzman was referred to Dr. Ashkan Abbey due to complaints of pain, burning, and decreased vision following his surgery. He was diagnosed with cystoid macular edema.

- On March 23, 2017, Key-Whitman sent Guzman a letter indicating it had become aware of a problem with a compounded medication used at Key-Whitman.

Herman examined Guzman and was familiar specifically with Guzman's condition and the cause of his condition. Herman also has treated and managed patients suffering from the same signs and symptoms as Guzman. Because of Herman's extensive experience using these injectable compounds and treating patients with retinal toxic events and their sequalae, Herman is familiar with the cause of injuries to patients who suffer from retinal toxic events and how such injuries occur and progress.

–8–

According to Herman, Guzman had a very specific retinal toxic event in which the retina was destroyed. The injury to Guzman's eye is a classic alkaline injury and, in reasonable medical probability, was caused by moxifloxacin with a pH of greater than 7.0 coming into contact with his eye. Herman's report explains that injury will occur if a compound's pH is not within a tolerable range for the confined space of the eye. And, for Guzman, too high of a pH caused a toxic effect on the tissue by restricting the blood supply to the tissue. Once the blood supply is diminished (due to a shrinking blood vessel), the amount of oxygen traveling to the retina is reduced, and ischemic injury occurs as a direct result. The toxicity of the formulation caused a breakdown of the tissue of Guzman's retina, which is irreversible. The degradation and death of retinal tissue was a proximate cause of the blindness Guzman has in his left eye. Further, within reasonable medical probability, Guzman will not regain vision in his left eye. Herman's report also excluded other potential causes of Guzman's injuries, including an infectious or inflammatory process or a complication from inappropriate or poorly-performed surgery. Instead, the early presentation of cystoid macular edema so soon after the surgical procedure was a direct result of the toxic effects of the use of the Guardian medication.

To satisfy the causation requirement of section 74.351(r)(6), an expert must explain "how and why" the alleged negligence caused the injury in question. *Zamarripa*, 526 S.W.3d at 460. An expert need not prove the plaintiff's case or account for every known fact; a report is sufficient if it makes "a good-faith effort to explain, factually, how proximate cause is going to be proven." *Id*. Herman's report represents a good-faith effort to summarize the causal relationship between Guardian's failure to formulate, prepare, and test its Tri-Moxi to meet a safe, nontoxic pH level and the harm to Guzman. *See, e.g., Baty*, 543 S.W.3d at 698. Specifically, Herman explained injury will occur if a compound's pH is not within a tolerable range for the confined space of the eye and opined Guzman suffered a classic alkaline injury to his left eye, resulting in vision loss

that he will not regain, caused by moxifloxacin with a pH greater than 7.0 coming into contact with his eye. We do not agree more detail, including either the specific pH of the medication injected into Guzman's eye or an explanation of what caused the pH to become "too high," was required. Herman's report explains, to a reasonable degree, how and why the alleged breach caused the injury to Guzman based on the facts presented.

Guzman's expert reports represent an objective good faith effort to summarize the experts' opinions regarding the applicable standards of care, how Guardian failed to meet those standards, and the causal relationship between the breach and Guzman's injury. *See* CIV. PRAC. & REM. § 74.351(l), (r)(6). The reports inform Guardian of the conduct Guzman has called into question with sufficient specificity and provide a basis for the trial court to conclude that the claims have merit. *See Baty*, 543 S.W.3d at 693. Accordingly, the trial court did not abuse its discretion in overruling Guardian's objections to the reports or denying its motion to dismiss. *See* CIV. PRAC. & REM. § 74.351(l). We overrule Guardian's first and second issues.

We affirm the trial court's order.

/Ada Brown/
ADA BROWN
JUSTICE

171464F.P05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

JMA PARTNERS, INC. D/B/A
GUARDIAN PHARMACY SERVICES
AND JACK R. MUNN, Appellants

No. 05-17-01464-CV          V.

JESUS GUZMAN, Appellee

On Appeal from the 95th District Court,
Dallas County, Texas
Trial Court Cause No. DC-17-06313.
Opinion delivered by Justice Brown;
Justices Schenck and Pedersen, III
participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

It is **ORDERED** that appellee JESUS GUZMAN recover his costs of this appeal from appellants JMA PARTNERS, INC. D/B/A GUARDIAN PHARMACY SERVICES AND JACK R. MUNN.

Judgment entered this 16th day of April 2019.