**Reversed, Rendered, and Remanded; Opinion Filed July 9, 2019.**



**In The**

# Court of Appeals
# Fifth District of Texas at Dallas

**No. 05-18-00939-CV**

**MATTHEW LOVITT, M.D., Appellant**
**V.**
**RAYMOND L. COLQUITT, Appellee**

**On Appeal from the County Court at Law No. 3**
**Dallas County, Texas**
**Trial Court Cause No. CC-17-03875-C**

# MEMORANDUM OPINION

Before Justices Myers, Osborne, and Nowell
Opinion by Justice Nowell

This is an interlocutory appeal from an order denying a motion to dismiss a health care liability claim under chapter 74 of the civil practice and remedies code. Matthew Lovitt, M.D., filed objections to the initial expert report filed by Raymond L. Colquitt. The trial court sustained the objections and granted a thirty-day extension to cure the report. After Colquitt submitted a revised report, Lovitt renewed his objections and moved to dismiss the case and recover his attorney's fees and costs. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(b). The trial court denied the motion to dismiss. Lovitt argues on appeal that the trial court abused its discretion by denying the motion to dismiss because the revised expert report fails to meet the standards required by section 74.351(r)(6) and does not constitute a good faith effort to comply with that section. We conclude the trial court abused its discretion by denying the motion to dismiss. We reverse the

trial court's order, render judgment dismissing Colquitt's claims against Lovitt, and remand for the trial court to determine the amount of Lovitt's reasonable attorney's fees and costs. *See id.*

## BACKGROUND

In his second amended petition, Colquitt alleged that Lovitt, Baylor University Medical Center, and Nurse Khadija Finger, were negligent in the care and treatment of Colquitt in connection with surgery performed by Lovitt. Colquitt was admitted to Baylor on May 16, 2015 complaining of stomach pain. He had several pre-existing conditions, including diabetes, hypertension, high cholesterol, asthma, morbid obesity, and chronic pain. Colquitt was diagnosed with cholelithiasis or gallstones. Lovitt, a surgeon, evaluated Colquitt on May 16, 2015 and determined that Colquitt's gallbladder should be removed laparoscopically (laparoscopic cholecystectomy). The surgery was performed on May 18, 2015 and Colquitt was discharged approximately six hours after the surgery. Colquitt alleged that while in the care of Baylor, he was not properly hydrated, was over-medicated, and was prematurely discharged after his surgery.

The next day, May 19, 2015, Colquitt fell at his home injuring his right hip and his right foot. He alleged he fell due to the "liver bleed after cholecystectomy," dehydration, acute blood loss/anemia, and being over-medicated. He also alleged the fall was due to the "omissions, treatment and/or care by Defendants."

Colquitt timely served the expert report of Stella Fitzgibbons, M.D., in support of his claims. The report is discussed in detail below, but stated in general that the defendants were negligent in discharging Colquitt within hours of his surgery, that he was at a high risk for falling due to his impaired mobility, weakness due to pain medications, and possible blood loss, and should not have been discharged "for at least one more day, or until his condition improved." Lovitt filed objections to the expert report and moved to dismiss the claims against him. He argued the expert was not qualified to render opinions in this matter and the report was insufficient as to

breach of the standard of care and causation. Thereafter, Colquitt dismissed several defendants and filed a response to the motion to dismiss. In his response, Colquitt stated that Lovitt's "surgical performance is not what is being evaluated, but the care and treatment of the Plaintiff following surgery." Following a hearing, the trial court signed a written order sustaining Lovitt's objections to the report and granting Colquitt thirty days to file an amended report.

Colquitt served an amended report which omitted the dismissed defendants and made other minor changes to the original report. Lovitt renewed his objections and motion to dismiss, arguing the amended report suffered the same deficiencies as the original report. The trial court denied the renewed objections and motion to dismiss.

## STANDARD OF REVIEW

We review a trial court's ruling on the sufficiency of an expert's report for abuse of discretion. *Baty v. Futrell*, 543 S.W.3d 689, 693 (Tex. 2018); *Children's Med. Ctr. of Dallas v. Durham*, 402 S.W.3d 391, 395 (Tex. App.—Dallas 2013, no pet.). A trial court abuses its discretion if it acts arbitrarily, unreasonably, or without reference to any guiding rules or principles. *Jelinek v. Casas*, 328 S.W.3d 526, 539 (Tex. 2010). The trial court has no discretion in determining what the law is or applying the law to the facts. *Sanchez v. Martin*, 378 S.W.3d 581, 587 (Tex. App.—Dallas 2012, no pet.). A clear failure by the trial court to analyze or apply the law correctly will constitute an abuse of discretion. *Walker v. Packer*, 827 S.W.2d 833, 840 (Tex. 1992) (orig. proceeding).

## EXPERT REPORT REQUIREMENT

Chapter 74 of the civil practice and remedies code requires a claimant pursuing a health care liability claim to serve one or more expert reports on each physician or health care provider against whom a health care liability claim is asserted no later than 120 days after the date each defendant's original answer is filed. TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(a). A report

–3–

meets the requirements of chapter 74 if it represents "an objective good faith effort to comply with the definition of an expert report." *Id.* § 74.351(l). "Expert report" is defined as:

> [A] written report by an expert that provides a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed.

*Id.* § 74.351(r)(6).

The expert report need not marshal all of the plaintiff's proof, *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 878 (Tex. 2001), but it must include a fair summary of the expert's opinion as of the date of the report on each of the three elements required by chapter 74: (1) the applicable standards of care; (2) the manner in which the care rendered by the physician or health care provider failed to meet the standards; and (3) the causal relationship between that failure and the injury, harm, or damages claimed. TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(6); *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002) (per curiam). To constitute a good-faith effort, the report must (1) inform the defendant of the specific conduct the plaintiff has called into question, and (2) provide a basis for the trial court to conclude the claims have merit. *Palacios*, 46 S.W.3d at 879.

To adequately identify the standard of care, an expert report must set forth "specific information about what the defendant should have done differently." *Palacios*, 46 S.W.3d at 880. While the Act requires only a "fair summary" of the standard of care and how it was breached, "even a fair summary must set out what care was expected, but not given." *Id.* (quotation omitted). In *Palacios*, the court held that an expert's opinion that the hospital did not take proper precautions to prevent a patient from falling did not sufficiently address the standard of care because it failed to apprise the parties of the specific conduct complained of—be it a failure to monitor more closely, restrain more securely, or something else altogether. *Id.*

–4–

The causation element requires that the expert explain "how and why" the alleged negligence caused the injury in question. *Jelinek*, 328 S.W.3d at 536. A conclusory statement of causation is inadequate; instead, the expert must explain the basis of his statements and link conclusions to specific facts. *Id.* at 539; *see also Columbia Valley Healthcare Sys., L.P. v. Zamarripa*, 526 S.W.3d 453, 461 (Tex. 2017) ("[W]ithout factual explanations, the reports are nothing more than the *ipse dixit* of the experts, which . . . are clearly insufficient."). In satisfying this "how and why" requirement, the expert need not prove the entire case or account for every known fact; the report is sufficient if it makes "a good-faith effort to explain, factually, how proximate cause is going to be proven." *Zamarripa*, 526 S.W.3d at 460. An expert's conclusion that in reasonable medical probability one event caused another, without explanation and without linking conclusions to the facts, differs little from an *ipse dixit*, which the supreme court has consistently criticized. *Jelinek.* 328 S.W.3d at 539. "[T]he expert must go further and explain, to a reasonable degree, how and why the breach caused the injury based on the facts presented." *Id.* at 539–40.

## DISCUSSION

The amended export report lists Fitzgibbons's training and experience and attaches her curriculum vitae. Fitzgibbons is a hospitalist and has taught community medicine and internal medicine. Her report states she has knowledge of the standard of care applicable "to the specific type of healthcare providers involved in this lawsuit concerning the evaluation, care and treatment in both the risk and prevention of injuries following certain medical procedures, similar to surgery under the same or similar circumstances in this case." She is familiar with the "evaluation, consultation, diagnosis, and treatment of patients" who have symptoms associated with "significant mobility impairment, weakness due to pain medications, and/or existence of blood loss." She is also familiar with standards relating to medical doctors for treating and observing

patients who present with a high risk of falling. Although she is not a surgeon, Colquitt states Fitzgibbons's opinion is limited to post-surgery care and she is not giving an opinion on the surgery performed by Lovitt.

Fitzgibbons based her opinion on medical records from Baylor regarding Colquitt's gallbladder surgery and from Texas Health Dallas regarding Colquitt's treatment after falling at home and surgery for an injury to his foot due to the fall.

The Baylor records indicate Colquitt was admitted on May 16, 2015. The records show:

> His blood count was normal, his glucose was moderately high due preexisting diabetes; kidney function was normal as were liver and coagulation tests. An abdominal ultrasound showed multiple gallstones, and Mr. Colquitt was scheduled for laparoscopic cholecystectomy; the consent form he signed before surgery cited a number of risks including injury to surrounding structures, pancreatitis etc., but there was no mention of hemorrhage. In addition to diabetes his other problems listed in the emergency center record included hypertension, high cholesterol and smoking a pack a day.

> Mr. Colquitt was evaluated by surgeon M. Lovitt MD on May 16; his resident saw him and Dr. Lovitt agreed that the gallbladder should be removed laparoscopically.

> Before surgery Mr. Colquitt was evaluated by the physical and occupational therapy departments, both of whom noted that he had significant mobility impairment; the nursing staff also performed a fall risk assessment on May 17 that showed a significant risk of falling, and they took appropriate precautions.

> It appears that on the day of surgery, May 18, 2015, the surgeon (M. Lovitt MD) left the operating room at 12:30 pm. A "PACU discharge" note reports that the patient was in no distress and that he left the building at 2:49 pm. A discharge note by Bach Tran MD stated, "Doing well. . . OK to go home per Dr. Lovitt." This was signed @ 3:18 pm.

The report summarizes the Texas Health Dallas records from May 20 to 23, 2015 as follows:

> These report that Mr. Colquitt had had gall bladder surgery on 5-18-15 at Baylor University Medical Center and had fallen 5-19-15 and two other times due to weakness which he blamed on pain meds. His white blood cell count was normal at 9.6, but his hemoglobin was only 8, and he had evidence of kidney injury with elevated BUN level and creatinine levels. A CT scan of the abdomen showed hyperdense fluid around the liver & spleen that was reported as "concerning for bleed", and Mr. Colquitt was admitted to the trauma service with Dr. Khouri as internal medicine consultant.

Discharge summary indicates that Mr. Colquitt was admitted to the trauma intensive care unit. A critical care consult added encephalopathy & hypotension to the list of his problems. He had consultation by the medicine and renal services; fortunately he was well enough to be discharged by May 23, with labs back to baseline and "Hypotension & shock resolved, likely hypovolemic due to intraabdominal bleed".

On June 5, 2015, Colquitt was admitted to Texas Health Dallas with a Lisfranc injury to his foot due to a fall in May 2015. He had surgery and was released. These medical records include a list of the several medications Colquitt was taking when he was discharged and his history, which included hypertension, diabetes, asthma, chronic pain, a total hip replacement, and bladder surgery.

The report continues:

It should have been reasonably expected that a patient who presents with the issues like Mr. Colquitt's, i.e., mobility, weakness due to pain medications, and loss of blood, would have not been discharged for at least one more day, or until his condition improved, which was not done in this matter. Specifically, Mr. Colquitt was at high risk of falling given the condition he was in at discharge. The doctors and nurses who cared for and treated Mr. Colquitt knew or should have known that given the fact that he had mobility issues, weakness due to pain medications, and loss of blood that he would fall or have some other episode leading to an injury. Falling is a well-known risk factor for injuries to patients with mobility impairment and weakness due to pain medications. Mr. Colquitt's problems would have alerted a reasonable medical doctor and nurse practitioner that Mr. Colquitt was at risk for problems after discharge and prompted overnight observation and re-evaluation before discharge.

It is my opinion that the cause of Mr. Colquitt's fall on or about May 19, 2015, and resulting injuries including, but not limited to, the injury to his foot were due to the Defendants' failure to provide appropriate care and treatment of Mr. Colquitt's obvious condition.

The report states the applicable standard of care as to Dr. Lovitt requires:

- The patient be protected from falling, especially under high-risk conditions to include mobility impairment, weakness due to pain medications, and existence of blood loss

- An adequate and comprehensive plan of care must be established and implemented on a timely basis to meet the patient's anticipated needs, including for the prevention of falls

–7–

- Patients with mobility impairment, weakness due to pain medications, and existence of blood loss who are at high risk of falling be closely monitored and followed with urgency

- Patients with mobility impairment, weakness due to pain medications, and existence of blood loss not be sent home, but rather be treated promptly and effectively in an appropriate medical facility, or at a minimum be followed up on very closely and with urgency

The report concludes with the following statements:

Dr. Lovitt's acts and/or omissions proximately caused Mr. Colquitt's injuries and breached the standard of care, and was negligent for failing to meet the applicable standard of care in his treatment of Mr. Colquitt—a patient who was at high risk for falls and other complications—in numerous ways, including the following:

- Failing to accurately assess Mr. Colquitt's condition and address Mr. Colquitt's problems and risks;

- Failing to take adequate and reasonable measures to protect Mr. Colquitt from falling until his conditions improved;

- Failing to timely establish and implement an adequate and comprehensive plan of care to meet Mr. Colquitt's medical needs, including the prevention of injury;

- Failing to closely monitor Mr. Colquitt for falling and follow up on Mr. Colquitt's injury promptly;

- By prematurely discharging Mr. Colquitt; and

- By failing to appreciate, diagnose and/or obtain a consultation relating to the mobility impairment, weakness due to pain medications, and possibility of blood loss or other surgical complications and still discharging the patient anyway.

In my opinion, the standard of care was also breached by the negligence of Baylor Hospital, by and through its agents, servants and employees who violated generally accepted standards of care for a reasonable and prudent hospital, that it was negligent in the care and treatment of Mr. Colquitt, that such negligence caused Mr. Colquitt's to be discharged prematurely which proximately caused him to fall resulting in injuries, and but for the negligence of Baylor Hospital and its employees, as set forth above the injuries to Mr. Colquitt could have been avoided.

In summary, it is probable that Mr. Colquitt sustained hypovolemic shock due to hemorrhage after laparoscopic cholecystectomy, leading to acute kidney injury & hypotensive shock. This resulting condition caused injuries complained of [sic] him to fall after leaving Baylor Hospital. This patient also was clearly at high risk for falls the day before surgery and also after surgery, and in my opinion, he should have stayed in hospital for at least one more night, or until his condition improved. Further, it should be noted that the preoperative consent form did not mention hemorrhage.

Among other deficiencies, Lovitt contends the amended report is conclusory as to the standard of care and causation. Specifically, the report fails to show how and why the alleged breaches of the standard of care, which in sum reduce to the failure to keep Colquitt in the hospital overnight after his surgery, proximately caused Colquitt's fall and injury to his foot. We agree the report is conclusory and does not represent a good faith effort to comply with the report requirement.

The report states in several places that Colquitt was at a high risk for falling because of his impaired mobility, weakness due to pain medications, and possible blood loss. As to possible blood loss as contributing to Colquitt's fall risk, the report does not identify any factual basis for the existence of blood loss at the time he was treated by Lovitt at Baylor. The loss of blood was not documented in the medical records until after Colquitt fell. The report does not give the opinion that the blood loss shown after the fall existed at the time of Colquitt's discharge from Baylor or was caused by any act or omission by Lovitt. The report's conclusion that blood loss contributed to Colquitt's high risk for falling before he was released from Baylor is not linked to the facts of this case. *See Zamarripa*, 526 S.W.3d at 461 ("[W]ithout factual explanations, the reports are nothing more than the *ipse dixit* of the experts, which . . . are clearly insufficient."); *Jelinek*, 328 S.W.3d at 539 (expert must explain the basis of his statements and link conclusions to specific facts).

The report identifies several standards of care, but only in general terms. The report does not explain how Colquitt could be protected from falling, what an adequate and comprehensive plan of care would entail, or what Lovitt was required to do to closely monitor Colquitt and follow up with urgency. The report does not identify what prompt treatment should have been given that would have been effective at improving Colquitt's pre-existing conditions. Nor does the report identify what an appropriate medical facility would be. In short, the report provides no insight or

guidance as to what "appropriate care and treatment" Colquitt should have received but did not. The statements of the standard of care are conclusory because they do not provide the "specific information about what the defendant should have done differently." *Palacios*, 46 S.W.3d at 880.

The report as a whole does indicate the expert's opinion that Colquitt should have been kept in the hospital overnight after his surgery. In a variety of ways, the report states that Colquitt should not have been discharged for at least one more day, or until his condition improved. But the report does not explain how and why another night in the hospital would have prevented his fall or reduced his risk of falling. The report fails to describe any treatment he should have received during this additional night or how that treatment would have been effective at reducing his risk of falling due to his impaired mobility and weakness due to pain medications. The report does not explain how and why the alleged breaches of the standards caused the injury. *See Jelinek*, 328 S.W.3d at 539–40 ("[T]he expert must . . . explain, to a reasonable degree, how and why the breach caused the injury based on the facts presented.").

The report ultimately concludes that it is probable that Colquitt "sustained hypovolemic shock due to hemorrhage after laparoscopic cholecystectomy, leading to acute kidney injury & hypotensive shock" and this condition caused him to fall after leaving Baylor. However, the medical records described in the report do not support the implied assumption that Colquitt suffered from this condition at the time he was released from Baylor. Those records indicate the condition existed after Colquitt fell, but the report states no opinion that the condition existed before the fall or that Lovitt's acts or omissions caused the condition. Nor does the report explain how keeping Colquitt in the hospital at least one more night would have prevented the "hypovolemic shock due to hemorrhage after laparoscopic cholecystectomy, leading to acute kidney injury & hypotensive shock."

Because the report lacks any explanation linking the expert's conclusions to the relevant

facts and fails to explain how and why the alleged breach proximately caused the injury, the report is conclusory and does not satisfy the requirements of chapter 74. Accordingly, the trial court abused its discretion by denying Lovitt's motion to dismiss.

## CONCLUSION

We reverse the trial court's order, render judgment dismissing Colquitt's HCLC against Lovitt with prejudice, and remand for the trial court to determine the amount of Lovitt's reasonable attorney's fees and costs. TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(b).

/Erin A. Nowell/
ERIN A. NOWELL
JUSTICE

180939F.P05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

MATTHEW LOVITT, M.D., Appellant

No. 05-18-00939-CV      V.

RAYMOND L. COLQUITT, Appellee

On Appeal from the County Court at Law No. 3, Dallas County, Texas
Trial Court Cause No. CC-17-03875-C.
Opinion delivered by Justice Nowell.
Justices Myers and Osborne participating.

In accordance with this Court's opinion of this date, the trial court's July 31, 2018 order denying appellant's motion to dismiss is **REVERSED** and judgment is **RENDERED** that appellee's claims against appellant are dismissed with prejudice. This case is remanded to the trial court to determine the reasonable attorney's fees and costs to be awarded to appellant pursuant to section 75.351(b)(1) of the civil practice and remedies code.

It is **ORDERED** that appellant Matthew Lovitt, M.D. recover his costs of this appeal from appellee Raymond L. Colquitt.

Judgment entered this 9th day of July, 2019.